# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | Chapter 15 |
| METINVEST B.V.,[1] | Case No.  16-10105 (LSS) |
| Debtor in a Foreign Proceeding. | |

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND RELATED RELIEF

Svitlana Romanova is the duly appointed foreign representative (the "**Foreign Representative**") of Metinvest B.V. (the "**Debtor**"), a private limited liability company incorporated under the laws of the Netherlands, in connection with a proceeding (the "**English Proceeding**") concerning a scheme of arrangement (the "**Scheme**")[2] under part 26 of the English Companies Act 2006 (as amended, the "**English Companies Act**") currently pending before the High Court of Justice of England and Wales (the "**High Court**").

The Foreign Representative has commenced this case ancillary to the English Proceeding and respectfully files this *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**") seeking, pursuant to sections 105(a), 1507, 1515, 1517, and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"), the entry of an order, in the form of the proposed order (the "**Proposed Order**") annexed hereto as Exhibit A, (i) recognizing the English Proceeding as a "foreign nonmain proceeding" under section 1517 of the Bankruptcy Code, and (ii) giving full force and effect to the Scheme in the United States if such Scheme is

---

[1]   The last four digits of the Metinvest B.V. United States Tax Identification Number are 3839.  The address of the registered office of Metinvest B.V. is Alexanderstraat 23, 2514 JM, The Hague, Netherlands.

[2]   Capitalized terms used but not defined herein shall have the meanings assigned to them in the Scheme.  A copy of the Scheme, and certain other documents relating to the Scheme, are attached as exhibits to the *Declaration of Daniel J. Guyder In Support of Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Guyder Declaration**") dated January 13, 2016 and filed contemporaneously herewith.

duly approved by the requisite majority of affected creditors and sanctioned by an order of the High Court (the "**Sanction Order**") in accordance with the English Companies Act.[3]

As described in the Convening Order of the High Court dated January 13, 2016 (the "**Convening Order**"),[4] a meeting of affected creditors to vote on the Scheme will be held on January 27, 2016 (the "**Scheme Meeting**") and a hearing to consider whether to sanction the Scheme and thereby make it binding in England is scheduled for January 29, 2016 (the "**Sanction Hearing**").  The effect of the Scheme will be to impose a temporary moratorium, lasting approximately four months, on holders of certain notes to prevent adverse creditor actions by such noteholders against the Debtor while the Debtor seeks to negotiate a comprehensive restructuring of its indebtedness.  The Foreign Representative is filing the Petition and the Provisional Motion prior to the Sanction Hearing and entry of the Sanction Order in an effort to align this ancillary case as closely as possible with the foreign proceeding and ensure seamless implementation of the Scheme.  The relief requested by the Foreign Representative with respect to the Scheme is conditioned on the prior entry of the Sanction Order by the High Court.  If the Sanction Order is entered, a copy will be promptly filed with this Court.

In support of the Petition, the Foreign Representative respectfully states as follows:

### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C.

---

[3]    Contemporaneously with the filing of the Petition, the Foreign Representative has filed a *Motion for Provisional Relief in Aid of Foreign Proceeding* (the "**Provisional Motion**") seeking the entry of an order enforcing the Scheme in the United States, on a provisional basis, pursuant to sections 105(a) and 1519 of the Bankruptcy Code prior to January 31, 2016 to protect the Debtor from potential adverse creditor action pending resolution of the Petition.

[4]    A copy of the Convening Order is annexed as Exhibit B to the Guyder Declaration.

§ 157(b)(2)(P).  Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) and (3) because the Debtor's principal asset in the United States is the shares of capital stock it owns in Metinvest U.S., Inc., a Delaware corporation, which is deemed to be located in Delaware,[5] and it is otherwise consistent with the interests of justice and convenience of the parties, having regard for the relief sought by the Foreign Representative.  The statutory predicates for the relief requested herein are sections 105(a), 1507, 1515, 1517, and 1521 of the Bankruptcy Code.

## BACKGROUND

*The Debtor*

     A.     <u>Business of the Debtor</u>

     1.     The Debtor and its subsidiaries (the "**Metinvest Group**") are, collectively, the largest vertically integrated mining and steel business in Ukraine, operating assets in each stage of the production chain from iron ore mining and processing, coking coal mining and coke production, through to semi-finished and finished steel production, pipe rolling and coil production and manufacturing other value-added products.

     2.     The Debtor was incorporated under the laws of the Netherlands on May 21, 2001 and is the ultimate holding company of the Metinvest Group.  As a holding company, its primary assets consist of its shares in its subsidiaries, intercompany receivables, and cash in its bank accounts. The Debtor has no revenue generating operations of its own, and therefore its cash flow and ability to service its indebtedness is dependent on the operating performance and financial condition of its operating subsidiaries.[6]

---

[5]    8 Del. C. Section 169.

[6]    An organizational chart detailing the structure of the Metinvest Group is attached as <u>Exhibit E</u> to the Guyder Declaration.

B.    Operations

3.    The Metinvest Group's business is divided into two divisions: (i) metallurgical and (ii) mining.  For the nine months ended September 30, 2015, the metallurgical segment accounted for approximately 79% of the Metinvest Group's external revenues, while the mining segment accounted for 21% of the Metinvest Group's external revenues.

i.    *The Metallurgical Division*

4.    The metallurgical division is responsible for the Metinvest Group's steel and coke products.  Its principal products include (i) finished steel products such as flat and long steel products and pipes, (ii) semi-finished steel products such as pig iron, slabs and billets, and (iii) coke.  The metallurgical division is comprised of thirteen key subsidiaries:

- Ilyich I&SW - the fourth largest Ukrainian integrated steel producer;

- Azovstal - the third largest Ukrainian steel producer;

- Yenakiieve Steel - a fully integrated steel producer located in Ukraine;

- Makiivka Steel - a producer of shapes and bars located in Ukraine;

- Khartsyzk Pipe - a producer of large diameter pipes located in Ukraine;

- Ferriera Valsider - a producer of plates and coils located in Italy;

- Promet Steel - a producer of shapes and bars located in Bulgaria;

- Metinvest Trametal and Spartan UK - producers of plates located in Italy and in the United Kingdom, respectively;

- Avdiivka Coke, Donetsk Coke and Zaporizhia Coke - producers of coke and chemicals located in Ukraine; and

- Inkor Chemicals - a producer of refined naphthalene and phenol and cresol products located in Ukraine.

5.    The Debtor's steel production business is conducted primarily through these subsidiaries.  The Debtor operates its steel trading and distribution businesses through Metinvest International S.A., Metinvest Ukraine, Metinvest Eurasia, Metinvest Distribution and Metinvest-SMC.  The metallurgical division also comprises Metinvest-Resource, a scrap metal company.  In the nine months ended September 30, 2015, the metallurgical division's external revenues and adjusted EBITDA were $4.3 billion and $523 million, respectively.[7]

ii.    *The Mining Division*

6.    The Debtor's mining division encompasses its iron ore and coal mining businesses. The Debtor's key products in this division are merchant iron ore concentrate and pellets, and coking coal concentrate.  The Debtor has six key subsidiaries in the mining division:

- Northern GOK and Ingulets GOK - the second and third largest iron ore mining companies in Ukraine by production volume in 2014;

- Central GOK - the sixth largest iron ore mining company in Ukraine by production volume in 2014;

- Komsomolske Flux Plant - a producer of fluxing limestone located in the Donetsk region of Ukraine;

- Krasnodon Coal – a producer of coking coal located in the Luhansk region of Ukraine; and

- United Coal Company - a producer of coking coal based in the United States.

In the nine months ended September 30, 2015, the mining division's external revenues and adjusted EBITDA were $1.1 billion and $335 million, respectively.

---

[7]    All amounts are denoted in USD unless explicitly stated otherwise.

iii.    *Trading and Logistics*

7.    The Debtor's trading and logistical assets serve both the metallurgical and mining divisions.  The Debtor sells steel, iron ore and coke and coal products to international markets in Europe, the Middle East, North Africa and South East Asia through Metinvest International S.A., to the Ukrainian market through Metinvest Ukraine and Metinvest-SMC; and to Commonwealth of Independent States markets (primarily Russia and Belarus) through Metinvest Ukraine, Metinvest Eurasia and Metinvest Distribution.  In addition, Metinvest-Shipping, a company based in Mariupol, Ukraine provides transportation and forwarding services for the Debtor's cargoes by railway and for their transhipment via sea ports. Belgorodmetallosnab provides warehouse and transhipment services for the Debtor in Russia.

C.    Ownership

8.    The Debtor is owned 71.24% by System Capital Management Limited (Cyprus) ("**SCM**"), a holding company registered in Cyprus, and 23.76% by the group of companies related to the SMART Group Ltd. ("**SMART**"), a company organized under the laws of Ukraine.  The remaining 5% has been acquired from the previous owners of the Ilyich Group,[8] which the Debtor acquired in 2010, for the benefit of SCM and SMART.  SCM is a member of the SCM Group, which is one of Europe's leading industrial groups with controlling interests in over 100 companies operating in the energy, finance, telecommunications, oil, clay mining, retail, real estate, media, agricultural, transportation and engineering sectors.  SMART is a diversified holding company with holdings in metals and mining, oil and gas, banking, agriculture, ship building and real estate.

---

[8]    The Ilyich Group was comprised of Ilyich Iron and Steel Works and Ilyich-Steel.

D.    Debt Structure

9.    The Debtor's primary obligations are (i) three series of Eurobond notes issued in May 20, 2010, February 14, 2011, and November 28, 2014 with an aggregate outstanding principal amount of approximately $1.12 billion (the "**Notes**"); and (ii) four pre-export finance facilities obtained in 2011, 2012, and 2013 with an aggregate principal amount outstanding of approximately $1.1 billion (the "**PXF Facilities**").[9]

10.    The Notes are unsecured obligations of the Debtor ranking *pari passu* as among themselves and have the benefit of a suretyship issued on a joint and several basis by certain of the Debtor's subsidiaries located in Ukraine (the "**Guarantors**").[10]  The Notes are governed by English-law trust deeds (the "**Trust Deeds**") with BNY Mellon Corporate Trustee Services Limited acting as trustee (the "**Trustee**").  The notes issued on May 20, 2010, were issued in an aggregate principal amount of $500 million ($85,238,250 remains outstanding), bear an interest rate of 10.25% and originally matured on May 20, 2015 but are now due on January 31, 2016 (the "**2016 Notes**"); the notes issued on February 14, 2011 were in an aggregate principal amount of $750 million, bear an interest rate of 8.75%, and mature on February 14, 2018 (the "**2018 Notes**"), and the notes issued on November 28, 2014 were in an aggregate amount of approximately $289.7 million, bear an interest of 10.50% and are due and payable in four equal instalments falling due on May 28, 2016, November 28, 2016, May 28, 2017, and November 28, 2017 (the "**2017 Notes**").

11.    The PXF Facilities are syndicated and in initial amounts of $1 billion, $560 million, $325 million and $300 million with an aggregate principal amount outstanding of

---

[9]    Amount calculated as of January 11, 2016.

approximately $1.1 billion. The PXF Facilities have the benefit of bank account pledges, security over sales proceeds, and a suretyship from certain of the Debtor's subsidiaries. The PXF Facilities provide for monthly amortization installments.

12.     In addition to the Notes and PXF Facilities, the Debtor is liable for other obligations including: (i) a loan agreement with Deutsche Bank AG insured by Euler Hermes Export Credit Agency, dated August 6, 2012, for an initial aggregate amount of approximately €24.6 million of which approximately €19.4 remains outstanding (the "**ECA Facility**"),[11] (ii) certain seller notes (the "**Seller Notes**") with $89.6 million outstanding issued by Metinvest U.S. Inc. and United Coal Company LLC ("**UCC**") and guaranteed by the Debtor in conjunction with Metinvest U.S. Inc.'s acquisition of UCC in April 2009;[12] (iii) two non-bank loans obtained from shareholders of the Debtor in 2014 with approximately $393 million in aggregate outstanding (the "**Shareholder Loans**");[13] and (iv) the Debtor has various short term borrowings from Metinvest International S.A., advanced between September 2014 and January 2015 which are due on January 31, 2016 (the "**MISA Loan**").[14] The Metinvest Group also relies on various short-term trade finance facilities for purchases of inventory and receivables obtained from banks and secured by pledges of inventories and/or the assignment of export proceeds.[15]

---

[10]   The Guarantors include the following entities: Avdiivka Coke Plant, Ingulets Iron Ore Enrichment Works, Khartsyzsk Pipe Plant, Central Iron Ore Enrichment Works, Northern Iron Ore Enrichment Works, Azovstal Iron & Steel Works, Yenakiieve Iron and Steel Works, and Metalen.

[11]   Amount calculated as of December 31, 2015.

[12]   On January 10, 2015, UCC, Metinvest U.S. Inc. and other relevant parties entered into extension documentation with the holders of the Seller Notes and extended the maturity of the Seller Notes to the end of 2016. Under the new terms and conditions, the outstanding amount of the Seller Notes will be repaid during 2016 in 12 equal monthly installments commencing January 31, 2016. The Debtor anticipates that it will agree with the holders of the Seller Notes to a contractual forbearance in relation to any non-payment under the Seller Notes during the moratorium proposed under the Scheme and therefore the Seller Notes are not subject to the Scheme.

[13]   Amount calculated as of December 31, 2015. The Debtor has informed these shareholders that it does not intend to repay any principal under these loans and would only pay certain accrued interest thereon after the Termination Date, subject to the terms of the Scheme. The Debtor anticipates that it will obtain a waiver from these shareholders in relation to any non-payment during the moratorium period and therefore the Shareholder Loans are not subject to the Scheme.

[14]   If the Scheme is implemented, the Debtor anticipates that the MISA Loan will be rescheduled to a date on or after the Termination Date so the MISA Loan is not subject to the Scheme.

[15]   The trade finance facilities are drawn primarily by the Debtor's operating subsidiaries including Metinvest International S.A., Metinvest Trametal, Ferriera Valsider, and UCC.

E.     Establishment in the United Kingdom

13.     The Debtor is organized under the laws of the Netherlands and conducts its business with customers throughout the world through various operating subsidiaries primarily located in Ukraine.  The Debtor has a branch office, the Metinvest B.V. UK Branch (the "**UK Branch**"), with operations located in London.  The UK Branch:

- is registered at the Companies House of England and Wales;[16]

- has office space leased by the Debtor from SCM Advisors Limited located at 25 Park Lane, London, W1K 1RA, UK (the "**London Office**"), which lease includes the supply of utilities, necessary goods and services for the commercial operation of the London Office, including the procurement of office equipment, computers, and various telecommunications systems to integrate the UK Branch with the Metinvest Group and its global customer base; and

- serves as the principal office for its Project Manager who provides corporate finance treasury services and additional services overseeing the restructuring and ongoing management of the Debtor's liabilities pursuant to a service agreement between the Debtor and Metinvest International S.A., a Swiss subsidiary of the Debtor.

14.     The Debtor also owns (directly or indirectly) three English operating subsidiaries: Spartan UK Limited, Metinvest Investments Limited, and Metinvest Capital UK Limited.  Further, the Notes are all governed by English law, as are the Trust Deeds and suretyships associated with the Notes, and the Trustee is located in London.  Indeed, virtually every aspect of the Notes is governed by English law.  If there is a dispute over the Trustee's compensation, it is to be decided by an expert selected by the President of The Law Society of England and Wales.  Further, the 2017 Notes and the 2018 Notes are governed by arbitration clauses calling for arbitration "under the London Court of International Arbitration, Arbitration Rules" and providing that the location of any arbitration "shall be London, England and the

---

[16]     The UK Branch is registered with establishment number BR017685.

language of the arbitration shall be English." In addition, under the 2016 Notes and the 2018 Notes, the Trustee has the option of proceeding by way of litigation, in place of arbitration. In connection with this option, the Debtor has irrevocably submitted to jurisdiction in England before English courts. Finally, the Foreign Representative was duly appointed by the High Court in London.

*Financial Difficulties*

15.    A significant portion of the Metinvest Group's assets is located in Ukraine. The substantial and on-going civil disturbances, political instability, and military action in the country since the end of 2013 have negatively impacted Ukraine's economy, and as a result, the Metinvest Group's business, results of operations and financial condition. These events have: (i) damaged and destroyed transport infrastructure, disrupting deliveries of raw materials and shipments of finished goods from some of the Metinvest Group's plants and even resulted in the death of at least one employee at a plant as a result of military shelling; (ii) caused production volumes of steel, iron ore, coke and coal products to decline; and (iii) affected economic activity and, as a result, domestic demand for steel and iron ore products. In addition, the Metinvest Group has suffered from the protracted depressed market prices for steel products, coal, and iron ore throughout much of 2014 and 2015. Further, the Debtor has been unable to obtain funding at this time from the international capital and loan markets to refinance existing indebtedness. The combination of decreased earnings from operations and the inability to raise new capital has created a liquidity crisis for the Debtor rendering it unable to repay its debts at this time and simultaneously maintain operations.

***Restructuring Efforts***

A.    <u>Defaults under the PXF Facilities and the Notes</u>

16.    As a consequence of the continued civil disturbances, political instability, and depressed market prices for iron ore and steel, the Debtor ceased paying in full the monthly amortization installments under the PXF Facilities falling due between February 10, 2015 and January 10, 2016 causing payment defaults under the PXF Facilities in a total amount of approximately $637 million (the "**PXF Defaults**") and providing grounds for the lenders under the PXF Facilities (the "**PXF Lenders**") to accelerate all amounts outstanding under the PXF Facilities.  The Debtor remains obligated to make further scheduled debt repayments under its PXF Facilities from January 11, 2016 to May 27, 2016 totalling approximately $140 million.

17.    Due to cross default provisions in the Notes, which provide that a payment default in an amount equal to or exceeding $50 million is an event of default under the Notes, the PXF Defaults effectively caused the Debtor to be in default with respect to the Notes (the "**Notes Defaults**" together with the PXF Defaults, the "**Defaults**").[17]  The Notes Defaults rendered the Notes susceptible to acceleration by the Trustee in its sole discretion, upon the request of one-fifth of the outstanding holders of the relevant Notes, or pursuant to an extraordinary resolution of the relevant noteholders.

B.    <u>The Consent Solicitations and PXF Standstill</u>

18.    In light of the Defaults and its looming liquidity crisis, the Debtor sought a forbearance of its obligations under the Notes and PXF Facilities beginning in the spring of 2015

---

[17]    The PXF Defaults also caused cross-defaults under the ECA Facility, which were initially waived until June 30, 2015 and then extended several times until January 29, 2016.  No principal payments fall due under the ECA Facility prior to May 27, 2016.  On the basis the Debtor has obtained bilateral waivers of cross defaults under the ECA Facility, the ECA Facility is not subject to the Scheme.

to provide a stable platform from which to negotiate a comprehensive restructuring of its financial indebtedness.

19.    On May 7, 2015, the Debtor launched a consent solicitation to holders of the 2016 Notes (the "**2016 Consent Solicitation**"), the holders of the 2017 Notes (the "**2017 Consent Solicitation**"), and the holders of the 2018 Notes (the "**2018 Consent Solicitation**", together with the foregoing, the "**Consent Solicitations**").   The 2016 Consent Solicitation sought, among other things, to defer the maturity of outstanding 2016 Notes, then due May 20, 2015, until January 31, 2016 and a waiver of certain ongoing and potential events of default under the 2016 Notes, together with payment of principal offered to holders of the 2016 Notes. The 2017 Consent Solicitation and 2018 Consent Solicitation sought primarily to waive certain ongoing and potential events of default.   On June 26, 2015, the Consent Solicitations were approved.   On July 2, 2015, in accordance with the terms of the 2016 Consent Solicitation, the Debtor made a payment of principal in the amount of $28,412,750 to holders of the 2016 Notes and the 2016 Notes are now due on January 31, 2016.

20.    On December 1, 2015 the Debtor entered into a standstill agreement (effective as of December 22, 2015) with approximately 84% of the PXF Lenders (the "**PXF Standstill**")[18] which provides for forbearance on enforcement action or the initiation of insolvency proceedings by the PXF Lenders who signed the PXF Standstill until January 29, 2016, unless the standstill period has been extended in accordance with its terms.

21.    Negotiations with the PXF Lenders and holders of the Notes have been on-going, and, on November 20, 2015, the Debtor circulated a proposal to restructure its outstanding obligations under the PXF Facilities and Notes (the "**Restructuring Proposal**").

However, with the consensual forbearance obtained in respect of the PXF Facilities and the Notes expiring on January 29, 2016 and January 31, 2016, respectively, the Debtor is left with little time to finalize and implement any comprehensive restructuring. Accordingly, the Debtor is seeking a further extension of the PXF Standstill pursuant to its terms and to implement the proposed temporary moratorium under the Scheme in respect of the Notes. For the avoidance of doubt, the Scheme only affects holders of the Notes. The Debtor considers that such a stable platform to conduct negotiations with its creditors is critical to enable it to continue operations and maintain access to vital trade finance facilities during the period required to reschedule its financial indebtedness.

*The Scheme*[19]

22.     In effect, the Scheme is a prelude to a more comprehensive debt restructuring that for now defers collection and enforcement action through a standstill to allow such negotiations to proceed. The Scheme provides the stability necessary for the Debtor to negotiate and finalize a restructuring and preserve operations for the benefit of all stakeholders. Specifically, the Scheme provides that the holders of the Notes, the Trustee, and the depository trust company holding the Notes (each a "**Scheme Creditor**" and collectively, the "**Scheme Creditors**") will not: (i) institute any step, action or proceeding against the Debtor, the Guarantors, or any of their subsidiaries to enforce the terms of the Notes, Trust Deeds, surety agreements, and guarantees related to the Notes; (ii) give written notice to the Debtor that any of the Notes are immediately due and payable or demand payment of any principal amounts under the Notes or any amount of interest which is not payable in accordance with the Scheme; or (iii)

---

[18]    The 84% figure is the percentage of PXF Lenders party to the PXF Standstill as of December 23, 2015. Additional lenders signed accession letters between December 24, 2015 and December 30, 2015 further increasing the percentage of PXF Lenders party to the PXF Standstill.

[19]    The summary of the Scheme provided in this section is for informational purposes only and is qualified in its entirety by the terms of the Scheme.

make a demand under the terms of any guaranty made in connection with the Notes (collectively, the "**Moratorium**").

23.    Pursuant to the Scheme, the Moratorium will be effective until the termination date which will occur at the earliest of: (i) May 27, 2016 unless Noteholders holding at least 50.01% of the Notes approve an early termination date, (ii) the occurrence of an Early Termination Date (being the later of March 31, 2016 or the date falling 10 business days after the date on which notice is received by the Debtor that the requisite majority of Noteholders have voted for an early termination),[20] (iii) the occurrence of an undeclared default (being any events of default other than those which were the subject of the Consent Solicitations and certain other events of default identified by the Debtor), (iv) the occurrence of a breach of scheme undertaking referred to in paragraph 24 below which is not remedied within the applicable remedy period, (v) the date on which any principal amount of the PXF Facilities is paid to the PXF Lenders (except as a result of it becoming unlawful for any amount to remain outstanding to a PXF Lender) during the period commencing on January 30, 2016 to and including May 27, 2016 unless the Debtor deposits an equal amount in a trust account for the Noteholders within 10 days, (vi) the date the Debtor announces a rescheduling proposal which includes a write-off of any outstanding principal amount of the Notes outstanding as of December 24, 2015, and (vii) the date on which the Debtor announces a rescheduling proposal which does not offer the same terms to all Noteholders (other than pursuant to the requirements of applicable mandatory securities laws) (collectively, the "**Termination Date**").

24.    Pursuant to the Scheme, the Debtor has agreed to a number of concessions and undertakings during the Moratorium, which if breached and not remedied in the specified

period, will result in termination of the Scheme. Specifically, the Debtor has undertaken to, among other things, (i) ensure that the Metinvest Group does not make any payments in respect of capital expenditure in any calendar month in an aggregate amount greater than $28 million, (ii) provide a monthly report to the Noteholders, (iii) publish the latest terms of the Restructuring Proposal in writing upon the request of a majority of Noteholders on and after April 1, 2016 and provided that the Early Termination Date has not occurred, (iv) not make and prohibit its subsidiaries from making principal and interest payments on account of the Shareholder Loans, (v) pay 30% of accrued and unpaid interest on the Notes and PXF Facilities on certain dates specified in the Scheme, (vi) pay further amounts of such interest depending on the unrestricted cash of the Metinvest Group, and (vii) procure a suretyship from Ilyich I&SW in favor of the Noteholders on a pari passu basis with (and subject to the same limits as) the PXF Facility suretyships on or before March 14, 2016.

25.     As consideration for the Moratorium, the Scheme contemplates that the Debtor will (i) pay to each Scheme Creditor on the date the Scheme is sanctioned by order of the High Court (the "**Scheme Effective Date**") a fee equal to $1.25 per $1,000 principal amount of Notes held by such Scheme Creditor on January 22, 2016 (the "**Scheme Consideration**"),[21] (ii) agree that any amount of accrued but unpaid interest through the Termination Date shall continue to bear interest in accordance with the terms of the Notes and such capitalized interest will be due and payable on the earlier of the Termination Date and the date a restructuring is agreed and becomes effective, and (iii) agree, during the Moratorium, to comply with the Scheme undertakings referred to in paragraph 24 above.

---

[20]    Such notice of termination may be given by the requisite majority of Noteholders between March 15, 2016 and March 31, 2016.

[21]    If the Early Termination Date has not occurred, the Debtor will pay to each Scheme Creditor a further amount equal to $1.25 per $1,000 principal amount of Notes held by such Scheme Creditor on April 1, 2016.

26.     If the Scheme is successfully implemented, all Scheme Creditors will be bound by the terms of the Scheme. The successful implementation of the Scheme, together with an agreed extension of the PXF Standstill in accordance with its terms, will provide the Debtor with a stable platform to negotiate a broader restructuring of the Notes, the PXF Facilitates, and various other financial obligations of the Debtor. Assuming that a restructuring is agreed, the Debtor considers that the Metinvest Group has sufficient assets to enable its creditors to be repaid the full principal amount owing to them over a period of time. Accordingly, the Scheme is an essential element of the Debtor's overall restructuring efforts.

27.     Failure to implement the Scheme could have dire effects on the Debtor and its creditors. The Debtor would likely run out of liquidity due to a cessation of trade finance and supplier credit, and the operating entities of the Metinvest Group, most of which are based in Eastern Ukraine, may be forced to shut down some or all of their production facilities causing long lasting damage to the business and more likely leading them to cease trading. In that event, the Debtor would need to consider filing for protective proceedings in the Netherlands, and certain creditors may be able to commence bankruptcy proceedings in the Netherlands or elsewhere. If the Dutch courts granted the company a suspension of payments, this would provide the Debtor only a short window to seek to agree a restructuring. However, there is a substantial risk that with multiple insolvency proceedings, the Metinvest Group would lose the majority, if not all, of its trade finance facilities and supplier credit, effectively eliminating its liquidity. This could set the stage for a Ukrainian protective bankruptcy proceeding which may result in either distressed asset sales or the assets being nationalized. Such distressed asset sales would likely be at forced sale values and materially lower than a going concern value due to the very limited buyers, if any, in the currently volatile Ukrainian market. If the assets are

nationalized, it is entirely uncertain how much value would be received. In both the sale and nationalization scenarios, however, there is a substantial risk that the Debtor will not be able to pay its creditors in full and it is unclear what the quantum or timing of distributions would look like.

### The English Proceeding

28.     The Debtor commenced the English Proceeding by filing claim forms in respect of the Scheme with the High Court on January 11, 2016, and the Foreign Representative was appointed by the Debtor to act as foreign representative in any chapter 15 case commenced in the United States in respect of the Debtor.[22] On January 13, 2016, following a hearing (the "**Convening Hearing**"), the High Court entered the Convening Order which, among other things: (i) authorized the Debtor to hold the Scheme Meeting for the purposes of considering and approving the Scheme by the Scheme Creditors, (ii) ordered that notice of the Scheme, together with an explanatory statement and proxy forms for voting at the Scheme Meeting, be made available to Scheme Creditors; and (iii) ordered that the Foreign Representative shall be appointed to act as a foreign representative in this chapter 15 case. Specifically, the Convening Order authorized the Foreign Representative to apply to a United States Bankruptcy Court for an order enforcing the Scheme and granting any other related relief under chapter 15 of the Bankruptcy Code.[23]

29.     Shortly following the Convening Hearing, and in accordance with the Convening Order, notice of the Scheme Meeting, the Scheme, a voting form (including guidance

---

[22]    The Debtor issued a Practice Statement Letter (the "**PSL**") in respect of the Scheme on December 24, 2015 in accordance with the guidance set forth by the High Court in its Practice Statement dated April 15, 2002. The purpose of the PSL was, among other things, to advise creditors of the objective of the Scheme and the Debtor's intentions to formally commence the English Proceeding proposing the Scheme to Noteholders. The PSL was posted to the Scheme Website (as defined below) and an announcement of the PSL was made on the Irish Stock Exchange with a reference to the Scheme Website. A copy of the PSL is annexed as <u>Exhibit A</u> to the Guyder Declaration.

[23]    Convening Order ¶ 25.

notes for the completing the voting form), and an explanatory statement (collectively, the **"Restructuring Documents"**) will be provided to the Scheme Creditors via the Depository Trust Company, Euroclear and Clearstream Luxembourg. In addition, copies of the Restructuring Documents will made available to all Scheme Creditors by Lucid Issuer Services Limited as information agent under the Scheme at www.lucid-is.com/metinvest (the **"Scheme Website"**). Finally, availability of the Restructuring Documents on the Scheme Website will be announced on the Irish Stock Exchange.

30. The Scheme will become legally binding upon, *inter alia*, the following:

(a) a vote in favor of the Scheme at the Scheme Meeting to be held in London on January 27, 2016 by a majority in number representing not less than 75% in value of voting Scheme Creditors;

(b) the issuance by the High Court of the Sanction Order; and

(c) delivery of the Sanction Order to the Registrar of Companies in England and Wales.

31. Following the Scheme Meeting, and upon receiving the necessary votes in favor of the Scheme, the High Court will conduct the Sanction Hearing. In an effort to align this chapter 15 case with the timing of the overall restructuring process and prevent enforcement action by Noteholders as a result of the 2016 Notes becoming due and payable on January 31, 2016, the Foreign Representative is seeking the relief requested in the Provisional Motion to be heard on or before January 29, 2016 and this Petition to be heard shortly thereafter upon expiry of the applicable notice period.

**RELIEF SOUGHT**

32.     By this Petition, the Foreign Representative seeks the following relief:

(A)     recognition, pursuant to section 1517 of the Bankruptcy Code, of the English Proceeding as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code;

(B)     enforcement of the Scheme, including any modifications or amendments thereof, in the United States pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code; and

(C)     such other and further relief as is appropriate under the circumstances pursuant to sections 105(a), 1507, and 1521, of the Bankruptcy Code.

**BASIS FOR SUCH RELIEF**

33.     For the reasons more fully discussed in the *Memorandum of Law* filed contemporaneously herewith, the English Proceeding is entitled to recognition under section 1517 of the Bankruptcy Code because:

(A)     the English Proceeding is (i) a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code and (ii) a "foreign nonmain proceeding" within the meaning of section 1502(5) of the Bankruptcy Code because the English Proceeding is located in a jurisdiction where the Debtor maintains an "establishment" within the meaning of section 1502(2) of the Bankruptcy Code;

(B)     the Foreign Representative is a "person" within the meaning of section 101(41) of the Bankruptcy Code and a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code;

(C)   the Petition was filed in accordance with sections 1504 and 1509 of the Bankruptcy Code; and

(D)   the Petition meets the requirements of sections 1504 and 1515 of the Bankruptcy Code.

34.   Further, the Scheme should be given full force and effect in the United States as either "additional assistance" under section 1507 of the Bankruptcy Code or "appropriate relief" under section 1521, as such enforcement is necessary to give effect to the Scheme with respect to Scheme Creditors taking action in the United States.

35.   Granting the requested relief would not be manifestly contrary to the public policy of the United States, as prohibited by section 1506 of the Bankruptcy Code. In fact, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code. Thus, the circumstances satisfy the conditions for mandatory recognition of the English Proceeding under section 1517 of the Bankruptcy Code and for the enforcement of the Scheme under sections 1507 and 1521 of the Bankruptcy Code.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests that this Court grant the Petition and enter the Proposed Order recognizing the English Proceeding as a "foreign nonmain proceeding" and giving full force and effect to the Scheme in the United States, and grant such other relief as the Court deems just and appropriate in the circumstances.

Dated: Wilmington, Delaware
      January 13, 2016

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

By: */s/ Joseph M. Barry*
Joseph M. Barry (Del. Bar No. 4221)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone (302) 571-6600
Facsimile (302) 571-1253
jbarry@ycst.com

-and-

**ALLEN & OVERY LLP**
Daniel Guyder
Mark Nixdorf
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
daniel.guyder@allenovery.com
mark.nixdorf@allenovery.com

*Attorneys for the Foreign Representative of the Debtor*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, Svitlana Romanova declares as follows:

I am the Chief Legal Officer and a member of the Executive Committee of Metinvest Holding LLC, and have been authorized to act as foreign representative of Metinvest B.V. I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**"). I have read the Petition, and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _____ day of January, 2016, in _____

_____
Svitlana Romanova

# EXHIBIT A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | Chapter 15 |
| METINVEST B.V.,[1] | Case No.  16-10105 (LSS) |
| Debtor in a Foreign Proceeding. | **Re: D.I. _____** |

### ORDER GRANTING RECOGNITION AND RELATED RELIEF

**THIS MATTER** was brought before the Court by Svitlana Romanova, the duly appointed foreign representative (the "**Foreign Representative**") of Metinvest B.V. (the "**Debtor**"), a private limited liability company incorporated under the laws of the Netherlands, in connection with a proceeding (the "**English Proceeding**") concerning a scheme of arrangement (the "**Scheme**") under part 26 of the English Companies Act 2006 (as amended, the "**English Companies Act**") currently pending before the High Court of Justice of England and Wales (the "**High Court**").

The Foreign Representative filed a *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**") on January 13, 2016 commencing the above captioned chapter 15 case under chapter 15 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") and seeking the entry of an order (i) recognizing the English Proceeding as a "foreign nonmain proceeding" under section 1517 of the Bankruptcy Code and (ii) giving full force and effect to the Scheme, including any modifications or amendments thereof, in the United States pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code if such

---

[1]    The last four digits of the Metinvest B.V. United States Tax Identification Number are 3839.  The address of the registered office of Metinvest B.V. is Alexanderstraat 23, 2514 JM, The Hague, Netherlands.

01:18148025.3

Scheme is duly approved by the requisite majority of affected creditors and sanctioned by the High Court in accordance with the English Companies Act.

At a hearing held on February __, 2016, the Court considered and reviewed the Petition and the other pleadings and exhibits submitted by the Foreign Representative in support thereof. After due deliberation and sufficient cause appearing therefor, the Court finds and concludes as follows:

(A)    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012, and section 1501 of the Bankruptcy Code.

(B)    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P) and the Court may enter a final order consistent with Article III of the United States Constitution.

(C)    Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) and (3).

(D)    The Foreign Representative is a "person" within the meaning of 11 U.S.C. § 101(41) and is the duly appointed "foreign representative" of the Debtor within the meaning of 11 U.S.C. § 101(24).

(E)    The chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504 and 1509, and the Petition meets the requirements of 11 U.S.C. §§ 1504 and 1515.

(F)    The English Proceeding is a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

(G)    The English Proceeding is entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

(H)    The English Proceeding is before the High Court in London, England, where the Debtor has an "establishment" within the meaning of 11 U.S.C. § 1502(2), and therefore constitutes a "foreign nonmain proceeding" pursuant to 11 U.S.C. § 1502(5) and is entitled to recognition as such pursuant to 11 U.S.C. § 1517(b)(1).

(I)    The Foreign Representative is entitled to discretionary relief pursuant to 11 U.S.C. §§ 1507 and 1521.

(J)    The relief granted herein is necessary and appropriate, in the interest of the public and international comity, and consistent with the public policy of the United States.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.    The English Proceeding is hereby recognized as a foreign nonmain proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

2.    The Scheme, including any amendments or modifications, is hereby given full force and effect in the United States pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code.

3.    This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any request for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

4.    The Petition and supporting papers shall be available upon request at the offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020 to the attention of Mark Nixdorf, (212) 610-6421, mark.nixdorf@allenovery.com.

5.    Notwithstanding Bankruptcy Rule 7062, made applicable to this chapter 15 case by Bankruptcy Rule 1018, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and upon its entry, this Order shall become final and appealable.

Dated: Wilmington, Delaware
      February __, 2016

_____
UNITED STATES BANKRUPTCY JUDGE

01:18148025.3

3