## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 15 |
| METINVEST B.V.,[1] | Case No.  16-10105 (LSS) |
| Debtor in a Foreign Proceeding. | |

### DECLARATION OF DANIEL J. GUYDER IN SUPPORT OF VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND RELATED RELIEF

DANIEL J. GUYDER, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

I am a member of the firm of Allen & Overy LLP, counsel to Svitlana Romanova, the duly appointed foreign representative (the "**Foreign Representative**") of Metinvest B.V., a private limited liability company incorporated under the laws of the Netherlands, in connection with a proceeding concerning a scheme of arrangement under part 26 of the English Companies Act 2006 currently pending before the High Court of Justice of England and Wales (the "**High Court**"). I respectfully submit this declaration in support of the Foreign Representative's *Verified Petition for Recognition of Foreign Proceeding and Related Relief* and accompanying *Memorandum of Law*.

1.      Attached is a true and correct copy of each of the following documents:

   A.      Practice Statement Letter dated December 24, 2015.

   B.      *Convening Order* of the High Court dated January 13, 2016.

   C.      Scheme of Arrangement between Metinvest B.V. and the Scheme Creditors.

   D.      Expert Report of Professor Stephen J. Lubben.

   E.      Metinvest Organizational Chart dated October 31, 2015.

---

[1]      The last four digits of the Metinvest B.V. United States Tax Identification Number are 3839.  The address of the registered office of Metinvest B.V. is Alexanderstraat 23, 2514 JM, The Hague, Netherlands.

2.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Dated: January 13, 2016
      New York, New York

/s/  Daniel J. Guyder
Daniel J. Guyder

**EXHIBIT A**

**Metinvest B.V.**
**Alexanderstraat 23, 2514 JM**
**The Hague, Netherlands**
**(Registered under the laws of Netherlands under Registration Number 24321697)**

## PRACTICE STATEMENT LETTER

24 December 2015

> **THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU MAY THEREFORE WISH TO TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

Dear Sir/Madam

**Proposed scheme of arrangement in relation to Metinvest B.V. (the Company) under Part 26 of the Companies Act 2006 (the Scheme)**

**PURPOSE OF THIS LETTER**

1.   This Practice Statement Letter relates to the Scheme and is written pursuant to and in accordance with the procedure and guidance laid down by the High Court of Justice of England and Wales (the **Court**) in its Practice Statement issued on 15 April 2002 (the **Practice Statement**). The purpose of this letter is to inform you of:

  (i)   the objective which the Scheme is designed to achieve;

  (ii)  the Company's intention formally to propose the Scheme to its Noteholders (as defined below);

  (iii) the Company's intention to apply to the Court to seek an order convening a meeting of the Scheme Creditors (as defined below) of the Company for the purpose of considering and, if thought fit, approving the Scheme;

  (iv)  certain jurisdictional points as regards the Scheme; and

  (v)   the composition of the meeting of Scheme Creditors that the Company proposes to convene for the purposes of voting on the Scheme.

2.   Terms not defined in this letter shall have the meaning given to them in the terms and conditions of the Notes (as defined below).

**BACKGROUND**

3.   The Company has issued the following series of Eurobonds with an aggregate outstanding principal amount of U.S.$1,124,972,250 (the **Notes**):

(a)     U.S.$500,000,000 (of which U.S.$85,238,250 remains outstanding) 10.25 per cent. guaranteed notes due 2016 (ISIN: XS0511379066, Common Code: 051137906, ISIN: US591555AA54, CUSIP: 591555AA5) (the **2016 Notes**);

(b)     U.S.$289,734,000 10.50 per cent. guaranteed notes due 2017 (ISIN: XS1145219652, Common Code: 114521965, ISIN: US591555AC11, Common Code: 114752894, CUSIP: 591555 AC1) (the **2017 Notes**); and

(c)     U.S.$750,000,000 8.75 per cent. guaranteed notes due 2018 (ISIN: XS0591549232, ISIN: US591555AB38, CUSIP: 591555 AB3) (the **2018 Notes**).

4.      The 2016 Notes fall due on 31 January 2016.[1] The 2017 Notes are due and payable in four equal instalments falling due on 28 May 2016, 28 November 2016, 28 May 2017 and 28 November 2017. The 2018 Notes fall due on 14 February 2018. If the Company is unable to repay the principal amount of U.S.$85,238,250 and/or interest on that amount of approximately U.S.$1.75 million that falls due on 31 January 2016, a payment default will occur in respect of the 2016 Notes. On the occurrence of such a payment default, cross defaults will occur under the 2017 Notes and the 2018 Notes. If a default occurs, the Trustee of each issue may, at its discretion and if so requested by holders of at least one-fifth in nominal amount in respect of each series of the Notes then outstanding, or if so directed by an extraordinary resolution of the relevant Noteholders shall, give notice to the Company that the corresponding Notes are, and they shall immediately become, due and payable together with accrued interest.

5.      The Notes are unsecured obligations of the Company ranking *pari passu* as between themselves. The Notes are guaranteed on a joint and several basis by the same operating subsidiaries of the Company in respect of each series of Notes.

6.      The Company is writing to you in your capacity as a holder (directly or indirectly) of any Notes or an interest in any Notes (a **Noteholder** and, together with all other holders of the Notes, the **Noteholders**) or, as the case may be, a Trustee. As a Noteholder or, as the case may be, a Trustee you are also a scheme creditor under the proposed Scheme (a **Scheme Creditor**), and this letter is also addressed to you in that capacity.

7.      This letter is being sent to Scheme Creditors via the Depository Trust Company, Euroclear and Clearstream, Luxembourg (the **Clearing Systems**). In addition, an electronic copy of this letter shall also be made available to all Scheme Creditors by Lucid Issuer Services Limited (in its capacity as information agent under the Scheme, the **Information Agent**) at www.lucid-is.com/metinvest (the **Scheme Website**) and will be generally available for inspection at the offices of the Information Agent at the address set out in paragraph 55 below.

8.      If you have assigned, sold or otherwise transferred your interest in the Notes or intend to do so in the future, you are requested to forward a copy of this letter to the person or persons to whom you have assigned, sold or otherwise transferred your interest in the Notes.

**REASONS FOR THE SCHEME**

9.      The Company and its subsidiaries (the **Group**) taken as a whole is the largest vertically integrated mining and steel business in Ukraine, operating assets in each stage of the production chain from iron ore mining and processing, coking coal mining and coke production, through to semi-finished and

---

[1]     Pursuant to the terms of the 2016 Notes, as amended by the 2016 Notes Consent Solicitation (as defined below), the repayment date for the 2016 Notes is 1 February 2016, being the next Business Day following 31 January 2016.

finished steel production, pipe rolling and coil production and production of other value-added products. A significant part of the Group's assets is located in Ukraine and has been affected by the ongoing significant civil disturbances and political instability since the end of 2013, as well as the ongoing military action in the country. These events have:

- damaged and destroyed transport infrastructure, disrupting deliveries of raw materials and shipments of finished goods from some of the Group's plants and resulted in the death of at least one worker as a result of shelling;

- caused production volumes of steel, iron ore, coke and coal products to decline; and

- affected economic activity and, as a result, domestic demand for steel and iron ore products.

10.   In addition, prices of steel products continued to decrease in 2014 and throughout 2015. The average benchmark price for hot-rolled coil (Metal Expert HRC CIS export FOB Black Sea) decreased by 32% year-on-year in the nine months ended 30 September 2015. In the fourth quarter of 2015 its price continued to decrease reaching the lowest level over the last 12 years. Furthermore, the prices of coal and iron ore are experiencing both volatility and overall declines. The benchmark iron ore price (Platts 62% Fe iron ore fines CFR China) dropped by 44% year-on-year in the nine months ended 30 September 2015, reaching U.S.$38.50 per tonne on 15 December 2015, which is the lowest level over the last ten years. Also, the Ukrainian Government has failed to pay VAT refunds due to certain members of the Group in a timely manner and has imposed income tax pre-payment requirements. Further, the Company has been unable to access the international capital and debt markets to refinance its existing debt. The Company does not expect any material improvement in its overall liquidity before 2018.

11.   As at the date of this letter, the Company has outstanding pre-export finance facilities (the **PXF Facilities**) with four syndicates of international commercial banks (the **PXF Lenders**) with an aggregate amount of approximately U.S.$1,089 million. Various subsidiaries of the Company have granted bank account pledges and/or sales proceeds security assignments in respect of the PXF Facilities. Operating subsidiaries of the Group have also granted a suretyship in respect of each PXF Facility.

12.   The Company was unable to pay in full debt repayments under its PXF Facilities falling due between 10 February 2015 and 24 December 2015. As a consequence, payment defaults under the PXF Facilities in a total amount of approximately U.S.$617 million have occurred. On 1 December 2015 the Company entered into a contractual standstill arrangement (the **PXF Standstill**) with certain PXF Lenders which provides for a forbearance on the taking of enforcement action or the initiation of insolvency proceedings by the PXF Lenders who sign the PXF Standstill until 29 January 2016 unless the standstill period has been extended. Further details of the PXF Standstill are set out at paragraphs 24 to 26 below. The effective date of the PXF Standstill occurred on 22 December 2015.

13.   Historically, the Group has a record of strong earnings and low leverage. The table below sets out the Group's consolidated EBITDA and leverage in each of its financial years from 2011 to 2015.

| | 2011 | 2012 | 2013 | 2014 | 2015 (9M)[2] |
|---|---|---|---|---|---|
| EBITDA[3] | U.S.$3.655 | U.S.$1.996 | U.S.$2.361 | U.S.$2.702 | U.S.$0.813 |

[2] 2015 figures are from the trading update of the Group for the nine months ended 30 September 2015.
[3] Adjusted EBITDA, calculated as profits before income tax, financial income and costs, depreciation and amortization, impairment and devaluation of property, plant and equipment, foreign exchange gains and losses (starting from 1 January 2015), sponsorship and other charity payments, share of results of associates and other expenses that the management considers non-core plus share in EBITDA of joint ventures starting 2013.

| (U.S.$ billions) | billion | billion | billion | billion | billion |
|---|---|---|---|---|---|
| **Leverage**[4] | 1.1x | 2.1x | 1.8x | 1.2x | 2.3x |

14.  The Company would normally expect to manage its financial indebtedness through a combination of earnings and refinancings through the international capital and debt markets. However, the Company is currently unable to raise capital in the international capital and debt markets due to the current situation in Ukraine. The Company therefore intends to reschedule the maturities of the Notes and the PXF Facilities in anticipation that in due course the international capital and debt markets will reopen for Ukrainian based borrower groups and that iron and steel prices will recover.

15.  The Company currently anticipates that a rescheduling of its indebtedness under the Notes and the PXF Facilities should be agreed and implemented on or prior to 27 May 2016. On 20 November 2015, as part of ongoing dialogue with the Group's creditors and following receipt of indicative restructuring proposals from the Group's creditors, the Company sent a proposal to restructure its outstanding obligations under the PXF Facilities and the Notes (the **Company's Proposal**) to the legal and financial advisers of an ad-hoc committee of Noteholders (the **Noteholder Committee**) and a co-ordinating committee of PXF Lenders (the **PXF Co-ordinating Committee**) and their legal and financial advisers. The Company's Proposal has not been made public and accordingly the Noteholder Committee has not reviewed it.  The directors of the Company acknowledge their duties to take account of the interests of all stakeholders, including the creditors, in the Restructuring process and the principle that the Restructuring should be based on the current priorities and recourse of those stakeholders.

16.  Key features of the Company's Proposal include:

   (i)    conversion of all outstanding Notes on a par for par basis, as a single class, into one single issuance consisting of two series of notes with extended maturity profiles (the **New Notes**);

   (ii)   conversion of all PXF Facilities on a par for par basis, as a single class, into one single facility consisting of two tranches with extended maturity profiles (the **New PXF Facility**);

   (iii)  an offer to Noteholders and PXF Lenders to participate voluntarily in a new committed credit facility (the **New Facility**). Participants in the New Facility would receive a series of New Notes or a tranche of the New PXF Facility which would be more favourable to the Noteholders/PXF Lenders than the remaining series or tranche;

   (iv)   provisions related to treatment of the shareholder loans to the Company (the **Shareholder Loans**);

   (v)    excess cash sweep for accelerated repayment of the Group's indebtedness including waterfall provisions related to priority of repayment;

   (vi)   terms of restrictions on dividends until repayment of a significant portion of the Group's outstanding indebtedness under the New Notes and the New PXF Facility and an annual cap thereafter, as well as restrictions on additional indebtedness, security and other encumbrances, and disposals; and

---

[4] Leverage is calculated as a ratio of total debt at the end of year to EBITDA for the relevant year for 2011-2014 ratios and as a ratio of total debt at the end of September 2015 to EBITDA for September 2014-September 2015 for 2015 (9M) ratio.

(vii)    financial terms applicable to the proposed New Notes, New PXF Facility and the New Facility, including as to interest rates and interest payment terms.

17.    The Company remains fully committed to working collaboratively with its creditors and looks forward to engaging in constructive dialogue with the Noteholder Committee and the PXF Co-ordinating Committee once the Company's Proposal has been evaluated and commented on by their respective financial and legal advisers.

18.    In order to maintain the stability of the Group during the period in which a restructuring of the Company's obligations to its creditors (including the holders of the Notes and the PXF Lenders) (a **Restructuring**) is agreed and implemented, the Company is seeking to maintain and extend the standstill arrangements currently in place in respect of the PXF Facilities (see paragraphs 24 to 26 below) and to implement the proposed moratorium under the Scheme. The Company considers that a stable platform from which to conduct negotiations with its creditors is critical to enable it to continue to operate normally insofar as this is currently possible in Ukraine and to have access to trade finance during the period required in order to reschedule its financial indebtedness.

19.    As part of its day to day operations the Group is reliant on trade finance facilities which are uncommitted. The Group's access to trade finance facilities has fluctuated over the past 24 months. As of 31 December 2014, the Group had U.S.$416 million outstanding under its trade finance facilities, a decrease of U.S.$495 million from U.S.$911 million as of 31 December 2013. The decrease in the amount of trade finance available was mainly attributable to the fact that a number of trade finance banks withdrew their exposure limits on pre-production financing, Ukrainian territory risk financing and goods in port financing facilities, among other things.

20.    As of 23 December 2015, the Group had approximately U.S.$234 million outstanding under its trade finance facilities (including U.S.$146 million drawn by Metinvest International S.A., a subsidiary of the Company). This represents a decrease of U.S.$166 million from U.S.$400 million as of 30 March 2015, due to withdrawal of lines and decrease in limits or additional drawing restrictions imposed by the trade finance banks. Further withdrawals of such lines or decreases in limits cannot be excluded, which represents a significant risk to the Group's liquidity situation. The current standstill arrangements between the Company and the PXF Lenders under the PXF Standstill and the proposed moratorium under the Scheme cannot, in the Company's view, be extended to its providers of trade finance. However, the Company considers that if standstill and moratorium arrangements are in place in respect of the PXF Facilities and the Notes respectively, this would materially improve the prospect for the Group of continuing to be able to access sufficient trade finance in order to maintain its operations insofar as that is possible in the current circumstances.

21.    Since the delivery of the Company's Proposal to the PXF Co-ordinating Committee and the legal and financial advisers of the Noteholder Committee referred to in paragraph 15 above, the financial condition of the Company has further deteriorated due to the continuing falls in iron ore and steel prices. Based on the Group's existing liquidity position, its current cash flow projections and the significant liquidity risk related to withdrawals of its trade finance facilities, the Group is not currently able to pay amounts falling due under the Company's PXF Facilities following the expiry of the PXF Standstill on 29 January 2016 although the Company intends to seek an extension of the PXF Standstill in accordance with its terms. In relation to the Notes, the Company anticipates that it will need a moratorium on enforcement action in respect of the Notes for a sufficient period following 31 January 2016 in order to allow for a Restructuring to be agreed and implemented. The Company intends, however, to pay interest which accrues on the Notes and the PXF Facilities during the period commencing on the effective date of the Scheme and ending on the Termination Date (as defined below) (the **Moratorium Period**) on the basis explained at paragraph 37 below.

**CONSENT SOLICITATIONS**

22.     On 7 May 2015 the Company launched:

    (i)     a consent solicitation to holders of the 2016 Notes (whose maturity date was, at the time, 20 May 2015) (the **2016 Notes Consent Solicitation**) seeking consent (inter alia) to defer the maturity of the remaining 2016 Notes until 31 January 2016, and a waiver of certain ongoing and potential events of default under the 2016 Notes, together with payment of principal offered to holders of the 2016 Notes; and

    (ii)     a consent solicitation to holders of each of the 2017 Notes (the **2017 Notes Consent Solicitation**) and the 2018 Notes (the **2018 Notes Consent Solicitation** and, together with the 2016 Notes Consent Solicitation and the 2017 Notes Consent Solicitation, the **Consent Solicitations**) seeking consent (inter alia) to waive certain ongoing and potential events of default under the 2017 Notes and the 2018 Notes.

23.     On 19 June 2015 the Company launched a Practice Statement letter in relation to a scheme of arrangement the terms of which provided for a moratorium on enforcement action by Noteholders until 31 March 2016. The Company did not proceed with the scheme because the Consent Solicitations were ultimately successful. On 2 July 2015, in accordance with the terms of the 2016 Consent Solicitation, the Company made a payment of principal in the amount of U.S.$28,412,750 to holders of the 2016 Notes.

**PXF STANDSTILL AND NOTEHOLDER COMMITTEE**

24.     Following the successful Consent Solicitations, the Company was able to finalise the PXF Standstill with the PXF Co-ordinating Committee and, as of the date of this letter, PXF Lenders whose participations in the loans outstanding under the PXF Facilities represent approximately 84% of all loans outstanding under the PXF Facilities have signed the PXF Standstill.

25.     The Company is currently in negotiations with the PXF Co-ordinating Committee and the advisers to the Noteholder Committee in connection with a Restructuring but does not anticipate that such negotiations will be concluded prior to the current expiry of the PXF Standstill on 29 January 2016 or 31 January 2016 in the case of the Notes. However, the Company intends to seek an extension to the PXF Standstill in accordance with its terms and in line with the proposed moratorium under the Scheme, in order to agree, finalise and implement a Restructuring during the extended PXF Standstill period.

26.     The Company considers that the absence of a stable financial platform from which to negotiate with all of its stakeholders a rescheduling of its financial indebtedness will significantly hamper the process of agreeing a Restructuring and potentially prejudices the ability of the Company and other members of the Group to survive as going concerns. Accordingly, the Company intends to propose a scheme of arrangement pursuant to Part 26 of the Companies Act 2006 as further described in this practice statement letter.

**JURISDICTION**

27.     The Company, which is incorporated in the Netherlands, considers that it is liable to be wound up in England under the Insolvency Act 1986 as an unregistered company and is therefore subject to the jurisdiction of the English Court under Part 26 of the Companies Act 2006.

28.     The Company considers that the court has jurisdiction to sanction the Scheme and that the Company has a sufficient connection to England and Wales for the court to exercise its discretion to sanction the Scheme. In particular, the terms and conditions of the Notes are governed by English law and the Trust Deeds relating to the Notes are governed by English law. Furthermore, a significant number of Scheme

Creditors are subject to the personal jurisdiction of the English court by virtue of having their registered office, central administration or principal place of business in the jurisdiction of the English Court. Further, the Regulation S Global Note Certificates representing the majority of the Notes are each registered in the name of The Bank of New York Depository (Nominees) Limited, an English registered company located and domiciled in England.

29.     The Company has also been advised by Dutch counsel that the Scheme would be recognised and given effect in the Netherlands.

## THE SCHEME CONVENING HEARING

30.     The Company intends to apply to the Court for permission to convene the Scheme Meeting (as defined below) at a hearing (the **Scheme Convening Hearing**), currently scheduled for 13 January 2016 in the Companies Court, Royal Courts of Justice, Rolls Building, Fetter Lane, London EC4A 1NL. Scheme Creditors will be notified in advance of any change to the date of the Scheme Convening Hearing in writing and/or via an announcement on the Irish Stock Exchange.

31.     Scheme Creditors will be informed of the precise date on which the Scheme Convening Hearing will take place via the Clearing Systems (and this information will also be available from the Information Agent via the Scheme Website) as soon as it has been confirmed by the Court.

## WHO WILL BE AFFECTED BY THE SCHEME?

32.     The Scheme will affect all Noteholders and the Trustees, who will be the Scheme Creditors. All Scheme Creditors (including those who do not vote in favour of the Scheme) will be bound by the terms of the Scheme, along with the Company.

## THE OBJECTIVE OF THE SCHEME

33.     The objective of the Scheme is to give the Company a stable platform while it negotiates a Restructuring. Further details of the Scheme will be set out in the explanatory statement to be provided in connection with the Scheme, which will be made available to Scheme Creditors shortly after the Scheme Convening Hearing (provided that the Court gives its permission to convene the Scheme Meeting).

34.     The compromise and arrangement provided for under the Scheme will be as follows.

(a)     Each Scheme Creditor will agree not to, and in the case of a Scheme Creditor other than a Trustee agree not to instruct any Trustee to (or agree not to vote in favour of a resolution of Noteholders to instruct the Trustee to):

(i)     institute any step, action or proceedings (including, without limitation, any step, action or proceedings of a kind referred to in Conditions 8(d), 8(e) or 8(g) of the 2016 Notes, Conditions 10(d), 10(e) or 10(g) of the 2017 Notes and Conditions 10(d), 10(e) or 10(g) of the 2018 Notes or any proceedings under the laws of any relevant jurisdiction which have an analogous effect) against the Company, the Guarantors or any of their Subsidiaries to enforce the terms of any Trust Deed, any Surety Agreement, any Guarantees or any of the Notes; or

(ii)    give written notice to the Company that any of the Notes are immediately due and payable or demand payment of any principal amounts under the Notes; or

(iii)   make a demand under the terms of any Guarantee,

7

in each case until the occurrence of the Termination Date (as defined in paragraph (b) below).

(b)     The termination date (the **Termination Date**) is the earliest of:

(i)      27 May 2016, unless Noteholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes approve the termination of the compromise and arrangements under the Scheme, such termination being effective as of the Early Termination Date (as defined in paragraph 38 below) in which case the Termination Date shall be the Early Termination Date;

(ii)     the occurrence of an undeclared default (being any events of default other than those potential events of default and/or events of default which were the subject of the Consent Solicitations and certain other events of default identified by the Company) in each case as will be set out in the Scheme;

(iii)    the occurrence of a breach of any undertaking set out in paragraph 37 below which is not remedied within the period, if any, specified therein;

(iv)    the date on which any principal amount of the PXF Facilities is paid to the PXF Lenders (except as a result of it becoming unlawful for any amount to remain outstanding to a PXF Lender) during the period commencing on 30 January 2016 to and including 27 May 2016 if no later than 10 days after such principal amount being paid the Company has not deposited in an English law governed trust account (the **Principal Trust Account**) an amount equal to such principal amount to be held on trust for the Noteholders in accordance with paragraph (c) below;

(v)     the date on which the Company announces a rescheduling proposal which includes a write-off of any principal amount of the Notes outstanding as at the date of this letter; and

(vi)    the date on which the Company announces a rescheduling proposal which does not offer the same terms to all Noteholders (other than pursuant to the requirements of applicable mandatory securities laws).

(c)     The aggregate amount credited to the Principal Trust Account (net of any fees and charges) will be distributed to the Noteholders pro rata to the outstanding principal amounts (together with any interest accrued thereon to the date of such distribution) under each series of Notes as soon as practicable following the Termination Date.

(d)     In consideration of the agreement by the Scheme Creditors referred to in paragraph 34(a) above, the Company will:

(i)      pay to each Scheme Creditor a moratorium fee in an amount equal to U.S.$1.25 per U.S.$1,000 principal amount of the Notes held by such Scheme Creditor on the date the Scheme becomes effective. If the Early Termination Date has not occurred in accordance with paragraph 34(b)(i) above, on 1 April 2016 the Company will pay to each Scheme Creditor a further moratorium fee in an amount equal to U.S.$1.25 per U.S.$1,000 principal amount of Notes held by such Scheme Creditor; and

(ii)     agree that any amount of accrued but unpaid interest to and including the Termination Date shall be capitalised and added to the principal amount of the relevant Notes on the relevant Determination Date (as defined below) and, accordingly, shall bear interest in accordance with the terms and conditions of such Notes, and, further, that the aggregate

8

amount of such capitalised interest (together with interest accrued thereon) shall be due and payable on the earlier of the Termination Date and the date a Restructuring is implemented and becomes effective.

35. If the Company and the Group are unable to maintain a stable platform during the period of negotiation of a Restructuring it is likely that the Group will need to suspend part or all of its operations. In that event the Company considers it likely either that it would need to seek formal protective action from its creditors through the commencement of suspension of payments proceedings (*surseance van betaling*) in the Netherlands or that one or more of its creditors would commence bankruptcy proceedings.

36. The Company considers that if it is unable to maintain a stable platform during the period in which it seeks to negotiate a Restructuring and if, as a result, it commences insolvency proceedings, the Company would not be able to repay its creditors (including the Scheme Creditors) in full and the quantum and timing of any distributions to its creditors is very uncertain. If the Company is successful in agreeing a consensual rescheduling with its Noteholders and the PXF Lenders the Company anticipates that it will be able to repay the full principal amount outstanding to its creditors in accordance with the terms of the Company's Proposal.

37. The Scheme will include the following undertakings by the Company during the Moratorium Period, the breach of which, if not remedied within the specified period, if any, will result in the occurrence of the Termination Date:

   (a) the Company will procure that the Group will not make any payments in respect of capital expenditure in any calendar month in an aggregate amount greater than U.S.$28,000,000 (the **Monthly Capex Amount**) (provided that any part of any unspent Monthly Capex Amount may be carried forward and added to any future Monthly Capex Amount until utilised);

   (b) the Company will provide a monthly report, in a form agreed with the legal and financial advisers to the Noteholder Committee (a **Monthly Report**), within 60 days of the last day of the calendar month (the **Delivery Date**) to which the Monthly Report relates. The first Monthly Report shall be in respect of the month of December 2015 and shall be published on or before 29 February 2016. The Company shall not be in breach of this undertaking if it has provided the relevant Monthly Report within 5 calendar days following the applicable Delivery Date;

   (c) on and after 1 April 2016 and provided that the Early Termination Date has not occurred in accordance with paragraph 34(b)(i) above, if so requested in writing by Noteholders holding 50.01% or more of the aggregate outstanding principal amount of the Notes, the Company will publish its latest proposal of the terms of a Restructuring within 15 days of receipt of such request in writing;

   (d) the Company will not make, and will not permit any Subsidiary to make, any Restricted Payment or any payment of principal owing in respect of any Shareholder Loans;

   (e) (1) subject to sub-paragraph (3) below, the Company will pay to the Noteholders and the PXF Lenders (as applicable) an amount equal to 30% of accrued and unpaid interest (whether or not then due under the relevant terms and conditions of the Notes or the terms of the PXF Facilities) under the Notes and the PXF Facilities up to but excluding the first Determination Date, and subsequently from the last Determination Date to but excluding the next Determination Date. **Determination Date** shall mean each of the following:

      (i) 31 January 2016;

      (ii) 15 February 2016;

9

(iii)    15 March 2016;

(iv)    the Early Termination Date, if this has occurred in accordance with paragraph 34(b)(i) above; and

if the Early Termination Date has not occurred:

(v)    15 April 2016;

(vi)    27 May 2016; and

(such amounts being **Cash Pay Interest Amounts**);

(2) in addition to the Cash Pay Interest Amounts and subject to sub-paragraph (3) below, the Company will pay an amount equal to the difference (if positive) between (x) the average of unrestricted cash balances (as determined in good faith by the Company) as of the close of business on Friday of each of the four weeks immediately preceding the relevant Determination Date and (y) U.S.$180,000,000, in respect of interest (other than Cash Pay Interest Amounts) accrued and unpaid under the Notes and the PXF Facilities (whether or not then due) up to but excluding the relevant Determination Date. Such amount shall be allocated and paid pro rata to the amounts of interest (other than Cash Pay Interest Amounts) accrued and unpaid (whether or not then due) under the Notes and the PXF Facilities (subject to rounding);

(3) the interest payable pursuant to sub-paragraphs (1) and (2) above shall be due and payable on date falling 5 Business Days following the Friday immediately prior to the occurrence of each Determination Date (the **Settlement Date**), provided that:

(i)    no Termination Date shall occur if the Company remedies any breach of its obligations under sub-paragraphs (1) and (2) above within 10 calendar days of the relevant Settlement Date; and

(ii)    if the relevant paying agents under the Notes (the **Paying Agents**) refuse or are unable to process all or part of the payments of due and/or accrued interest under the Notes referred to in sub-paragraphs (1) and (2) above (such unpaid amount being the **Relevant Interest Amount**) as contemplated above, the Company will deposit in an English law governed trust account (the **Interest Trust Account**) an amount equal to the Relevant Interest Amount to be held on trust for the Noteholders within 10 calendar days of the relevant Settlement Date. Payment of the Relevant Interest Amount to the Interest Trust Account will discharge the payment obligations of the Company under sub-paragraphs (1) and (2) above in respect of the Relevant Interest Amount. The aggregate amount credited to the Interest Trust Account (net of any fees and charges) will be distributed to the applicable Noteholders in accordance with their entitlements under sub-paragraphs (1) and (2) above as soon as practicable following the earlier of (i) the date the Paying Agents confirm to the Company that they will process the applicable Relevant Interest Amount and (ii) the Termination Date;

(4) during the Moratorium Period, interest payments under the Notes shall be due solely on the relevant Settlement Dates and no interest shall be payable under the Notes on any other dates specified in the relevant terms and conditions of the Notes;

(f)    the Company will not make any payment in respect of interest owing under any of the PXF Facilities in amounts additional to those contemplated under paragraph (e) above, unless any such additional payment is made in respect of the Notes and the PXF Facilities pro rata to the

amounts of interest then accrued and unpaid under the Notes and the PXF Facilities and on the Settlement Dates; and

(g)    the Company will not make any payment in respect of interest owing under the Shareholder Loans.

38.    Noteholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes may approve in writing with notice to the Company between 15 March 2016 and 31 March 2016, inclusive (the **Termination Notice**) that the compromise and arrangements under the Scheme shall terminate in accordance with paragraph 34(b)(i) above, in which case the Termination Date shall occur on the later of:

(a)    31 March 2016; and

(b)    the date falling 10 Business Days after receipt by the Company of the Termination Notice,

(the **Early Termination Date**).

39.    The Company is entitled to make payments in respect of interest owing under the Shareholder Loans which accrues but is unpaid during the Moratorium Period at any time on and following:

(a)    the date falling the day after the Early Termination Date if the Early Termination Date has occurred in accordance with paragraph 34(b)(i) above; and

(b)    28 May 2016, if the Early Termination Date has not occurred in accordance with paragraph 34(b)(i) above,

provided that in either case, the Company will not make any such payments (A) if the interest under any of the Notes or the PXF Facilities is not paid in full and in cash in accordance with the terms and conditions of the relevant Notes and (B) in excess of an aggregate amount of U.S.\$2.3m for each month during the Moratorium Period.

40.    It shall be a condition to the effectiveness of the Scheme that:

(a)    no breach of Condition 5.3A of the 2016 Notes or Condition 6(i) of the 2017 Notes and the 2018 Notes shall have occurred and be continuing as of the date the Scheme is sanctioned by the Court; and

(b)    the Company has published the Monthly Reports for the months of October 2015 and November 2015.

## THE SCHEME MEETING AND THE PROPOSED VOTING CLASS

41.    Under the provisions of Part 26 of the Companies Act 2006, the Scheme must be agreed by a majority in number, representing at least 75% in value, of each class of Scheme Creditors present and voting either in person or by proxy at the relevant class meeting ordered to be summoned by the Court. The Scheme must then be sanctioned by the Court at a subsequent court hearing and a copy of the order delivered to the Registrar of Companies before it can become effective.

42.    If the rights of creditors are so different or would be affected so differently by the Scheme as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate meeting must be held for each class of creditor.

43. Under the terms of the Practice Statement it is the responsibility of the Company to formulate the class or classes of creditors for the purpose of convening meetings to consider and, if thought fit, approve the Scheme.

44. The Company has considered the existing and prospective rights of the Scheme Creditors against the Company in the absence of the Scheme and the rights of the Scheme Creditors under the proposed Scheme. Having considered these rights, the Company has concluded that it is appropriate that the Scheme Creditors vote in a single class meeting.

45. The Company has placed particular reliance on the matters set out below when reaching the conclusion that it is appropriate for the Scheme Creditors to vote in a single class meeting.

**The existing rights of the Scheme Creditors against the Company:**

(i) The Company considers that the existing rights of the Scheme Creditors against the Company are not so dissimilar as to make it impossible for them to consult together with a view to a common interest, in that:

    (A) If the Company does not repay the 2016 Notes once they have fallen due on 31 January 2016 and there is no scheme moratorium which is effective at that date, the 2016 Notes will be immediately due and payable and the Trustee will become entitled to take steps to enforce the 2016 Notes at its discretion or if instructed by the holders of at least one-fifth in principal amount of the respective Notes outstanding or so directed by an extraordinary resolution of the relevant Noteholders.

    (B) As a result of a non-payment of the 2016 Notes, cross-defaults will occur under the terms of the 2017 Notes and the 2018 Notes. Further, Events of Default under the 2017 Notes and the 2018 Notes will occur on 31 January 2016 following the expiry of the waivers pursuant to the Consent Solicitations. Accordingly, the 2017 Notes and the 2018 Notes will become capable of acceleration by the relevant Trustee at its discretion or by the relevant Trustee if instructed by the holders of at least one-fifth in principal amount of the respective Notes outstanding or if directed by an extraordinary resolution of the relevant Noteholders. Upon acceleration, the 2017 Notes and the 2018 Notes will be immediately due and payable and the relevant Trustee will become entitled to take steps to enforce the 2017 Notes and the 2018 Notes at its discretion or if instructed by the holders of at least one-fifth in principal amount of the respective Notes outstanding or so directed by an extraordinary resolution of the relevant Noteholders.

**The rights of the Scheme Creditors in the event of the Company's liquidation:**

(ii) In the event of the insolvent liquidation of the Company, the rights of the Scheme Creditors in a liquidation scenario will also be sufficiently similar, since, as unsecured creditors of the Company guaranteed on a joint and several basis by the same operating subsidiaries of the Company in respect of each series of Notes and ranking *pari passu* between themselves, holders of the Notes will have materially the same rights against the Company in that scenario.

**The rights of the Scheme Creditors under the Scheme:**

(iii) The rights of the Scheme Creditors under the Scheme are not such as to prevent them from consulting together with a view to a common interest. This is because there is no differential treatment of 2016, 2017 and 2018 Noteholders under the Scheme. Rather, the 2016, 2017 and 2018 Noteholders will be treated in the same way under the Scheme. In particular, if the Scheme becomes effective, the suspension of rights of Noteholders until the occurrence of the

12

Termination Date provided for under the Scheme will have a substantively similar effect on all of the Notes.

46.   For these reasons, the Company considers that the rights of the Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to a common interest. Rather, the Company considers that the Scheme Creditors are able to consult together, irrespective of the fact that some Scheme Creditors may hold different series of Notes.

47.   Accordingly, it is proposed that a single meeting of the Scheme Creditors is convened for the purposes of considering and, if the Scheme Creditors think fit, approving the Scheme (the **Scheme Meeting**).

## SCHEME CREDITOR ISSUES

48.   If you disagree with the Company's proposals regarding the convening of the Scheme Meeting outlined above (including the proposed composition of the voting class) or wish to raise any other issue in relation to the constitution of the Scheme Meetings or any other matters that otherwise affect the conduct of the Scheme Meetings, you should write to Allen & Overy LLP as soon as practicable using the contact details below, in advance of the Scheme Convening Hearing, setting out your concerns. In addition, you may attend before the Court at the Scheme Convening Hearing and make any representations you wish on that subject.

49.   Please note that if the Scheme is approved at the Scheme Meeting, it will still be possible for Scheme Creditors to raise objections on the question of class (as well as other matters) at a subsequent court hearing to sanction the Scheme which is anticipated to be held on 29 January 2016. However, in that event, the Court is likely to expect Scheme Creditors to show good reason why they did not object to the constitution of the classes of Scheme Creditors at an earlier stage.

## SCHEME WEBSITE

50.   The Information Agent has set up the Scheme Website (www.lucid-is.com/metinvest) to disseminate information about the Scheme and to facilitate the implementation of the Scheme. Scheme Creditors may download documents relating to the Scheme from the Scheme Website.

## NEXT STEPS

51.   As noted above, we anticipate that the Scheme Convening Hearing will take place on 13 January 2016. Scheme Creditors will be notified in advance if there is a change to the proposed date. Shortly following the Scheme Convening Hearing, Scheme Creditors will be provided with certain documents in connection with the Scheme. The documents will be comprised of:

   (a)   a copy of the scheme of arrangement;

   (b)   the explanatory statement required to be provided pursuant to section 897 of the Companies Act 2006 (which will include a notice setting out the relevant details for the Scheme Meeting); and

   (c)   the forms of proxy for voting or instructions in relation to electronic voting (as applicable) at the Scheme Meetings.

52.   The documentation in relation to the Scheme referred to in paragraph 51 will also be made available by the Information Agent to the Scheme Creditors via the Scheme Website.

53.     Based on the current timetable, the documents listed in paragraph 51 above will be uploaded to the Scheme Website and will be circulated to Scheme Creditors via the Clearing Systems on or around 11 January 2016.

54.     Assuming that the Court orders that the Scheme Meeting be convened by the Company, the proposed date on which the Scheme Meeting will be held is 27 January 2016.

**Contact Details and Further Information**

55.     If you have any questions in relation to this letter or the Scheme, please contact the Information Agent and/or the Company's solicitors, Allen & Overy LLP, using the contact details below:

**Lucid Issuer Services Limited as the Information Agent**
Tankerton Works
12 Argyle Walk
London WC1H 8HA
Email:              metinvest@lucid-is.com
Phone:             +44 (0) 207 704 0880
Fax:               +44 (0) 207 067 9098
Attention of:      David Shilson / Thomas Choquet

**Allen & Overy LLP as the Company's solicitors**
One Bishops Square
London
E1 6AD
Phone:             +44 (0) 203 088 0000
Email:             sirene@allenovery.com
Attention:         Mark Sterling / Rupert Cheetham


Yours faithfully


.....................................

ITPS (Netherlands) B.V.
represented by Mr John Willekes MacDonald

Authorised Signatory of the Company

**EXHIBIT B**

Claim No. CR-2016-000129

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**THE HONOURABLE MRS JUSTICE PROUDMAN**

**WEDNESDAY THE 13th DAY OF JANUARY 2016**

**IN THE MATTER OF METINVEST B.V.**

**AND**

**IN THE MATTER OF THE COMPANIES ACT 2006**

---

**ORDER**

---

**UPON THE APPLICATION** by Part 8 Claim Form dated 11 January 2016 (the "**Claim Form**") of Metinvest B.V. (the "**Company**") whose registered office is Alexanderstraat 23, 2514 JM The Hague, The Netherlands.

**AND UPON HEARING** David Allison QC as Leading Counsel and Stephen Robins as Junior Counsel for the Company ~~and~~ Mr William Trower QC for the Consenting Shareholders

**AND UPON READING** the Claim Form and the evidence

**AND UPON** the Court adopting in this Order, save where terms are otherwise expressly defined, the abbreviations, words and phrases contained in the Scheme Document (as defined below) to be circulated to Scheme Creditors pursuant to this order

**IT IS ORDERED AND DIRECTED** that:

1.      The Company be at liberty to convene a single meeting (the "**Scheme Meeting**") of its Scheme Creditors to be held at 10.00 a.m. (London time) on 27 January 2016 at the offices of Allen & Overy LLP, One Bishops Square, London E1 6AD (or if such venue is not available, such other suitable venue in London as the chairman of the Scheme Meeting may select) for the purpose of considering and, if thought fit, approving (with or without modification) a scheme of arrangement pursuant to Part 26 of the Companies Act 2006 (the "**Act**") proposed to be made between the Company and its Scheme Creditors (the **Scheme**).

2.      Mr Mark Sterling, a partner at Allen & Overy LLP , or if for any reason he is unable to act, Mr Ian Field, a partner at Allen & Overy LLP, or if for any reason he is unable

- 1 -

to act, any other partner at Allen & Overy LLP be appointed to act as chairman of the Scheme Meeting (and any adjournment thereof) (the "**Chairman**").

3.      The Scheme Meeting shall commence at 10.00 a.m. (London time) on 27 January 2016 by the Chairman opening the Scheme Meeting and outlining the main terms of the Scheme proposed, the method of voting at the Scheme Meeting and any other appropriate matters, following which a vote shall be taken on the proposed Scheme, following which the Chairman shall give a closing address. Following the closing address, the Scheme Meeting shall be closed.

4.      On the date of this Order, copies of:

    (a)      the notice convening the Scheme Meeting (the "**Notice**");

    (b)      the document incorporating the Scheme and the explanatory statement required to be provided pursuant to section 897 of the Act; and

    (c)      the account holder letter, including the form of sub-proxy for the DTC Participants, for voting at the Scheme Meeting (the "**Account Holder Letter**"),

(together, the "**Scheme Document**")

shall be made available to all Scheme Creditors to download on the website set up for the Scheme Creditors at www.lucid-is.com/metinvest (the "**Scheme Website**") and they shall be notified of the availability of the Scheme Document, via Euroclear, Clearstream or DTC.

5.      The Notice and a notification of the availability of the Scheme Document shall also be circulated to Scheme Creditors on or about 13 January 2016:

    (a)      by the delivery of notices to Euroclear, Clearstream and DTC for communication to Noteholders;

    (b)      via an announcement on the Irish Stock Exchange; and

    (c)      as otherwise required by the rules of the Irish Stock Exchange.

6.      Any supplemental information not included in the Scheme Document which the Company wishes to provide to the Scheme Creditors in advance of the Scheme Meeting shall be provided to the Scheme Creditors on the Scheme Website and via Euroclear, Clearstream or DTC in as much time before the Scheme Meeting as is reasonably practicable so that Scheme Creditors can properly consider such supplemental information for the purposes of the Scheme Meeting.

7.      Until the date of the Scheme Meeting, each Scheme Creditor may request to receive a hard copy of the Scheme Document in writing to Lucid Issuer Services Limited, (the

"**Information Agent**"), at its registered office, Tankerton Works, 12 Argyle Walk, London WC1H 8HA, by telephone: +44 (0) 207 704 0880, or by email to metinvest@lucid-is.com or by fax to fax number: +44 (0) 207 067 9098, marked for the attention of David Shilson or Thomas Choquet. If so requested, a hard copy of the Scheme Document shall be provided free of charge.

8.    The Scheme Document shall be available for inspection by a Scheme Creditor at the registered office of the Information Agent as set out in paragraph 7 above on each business day from the date of this Order until the conclusion of the Scheme Meeting.

9.    Unless the Court otherwise orders or directs, the accidental omission to provide notice of the Scheme Meeting to any Scheme Creditor or the non-receipt of notice of the Scheme Meeting by any Scheme Creditor shall not invalidate the proceedings at the Scheme Meeting.

10.    The Scheme Document shall be distributed in the form or substantially in the form of the drafts submitted to and initialled by the Court for identification purposes, subject to the completion of blanks and minor modifications as advised by solicitors and counsel to the Company.

11.    Scheme Creditors be requested to return or procure the return of their completed Account Holder Letter(s) in respect of their holding of Notes to the Information Agent marked for the attention of David Shilson or Thomas Choquet, via email to metinvest@lucid-is.com so as to be received by the Voting Instruction Deadline being 10.00 a.m. (London time) on 26 January 2016, or if a Scheme Creditor is attending the Scheme Meeting in person or by proxy, to hand its completed and signed Account Holder Letter(s) to the Chairman no later than one hour prior to the commencement of the Scheme Meeting.

12.    The Chairman shall be at liberty, without the consent of the Scheme Creditors, to adjourn the Scheme Meeting and any adjourned Scheme Meeting from time to time to the same or another place in London, and to such date and time as he shall decide, by posting such notice to the Scheme Creditors on the Scheme Website and via Euroclear, Clearstream or DTC.

13.    The Chairman shall be at liberty to accept an Account Holder Letter sent by email or fax provided that it is legible to him, but may require production of further documentation if he considers this to be necessary or desirable for the purpose of verification or to reject such Account Holder Letter if illegible/unverifiable.

14.    The Chairman shall be entitled to rely on the signature on the Account Holder Letter, including one sent by email or fax as a warranty that the signatory has been duly authorised by the relevant Scheme Creditor to sign the Account Holder Letter on behalf of that Scheme Creditor without further investigation.

- 3-

15. The Chairman shall be at liberty, but under no obligation, to accept an otherwise incomplete or late Account Holder Letter at his discretion after the date fixed in the Notice for the purpose of voting at the Scheme Meeting (but, for the avoidance of doubt, provided that any such Account Holder Letter is received before he closes the Scheme Meeting and that the Notes in respect of which the Account Holder Letter is submitted have been blocked prior to the Custody Instruction Deadline (if applicable) or the Account Holder Letter includes a Medallion Signature Guarantee (if applicable)).

16. The value of a Scheme Creditor's claim for the purposes of voting at the Scheme Meeting shall be determined by the Chairman in the exercise of his discretion and for this purpose the Chairman shall be entitled to have regard to all relevant information whether supplied by a Scheme Creditor in an Account Holder Letter or otherwise available to the Chairman. The Chairman shall be entitled to rely on information provided by the Information Agent to calculate as of the Record Date the amount of Scheme Claims for voting purposes of each Scheme Creditor on whose behalf a valid Account Holder Letter has been submitted.

17. The claim of a Scheme Creditor for voting purposes shall be calculated as at the Record Date.

18. A Scheme Creditor may appoint more than one person as its proxy, and, if the appointee is not the Chairman, may provide in the appointment that the appointee may vote in the appointee's absolute discretion.

19. Scheme Creditors who wish to be represented in person at the Scheme Meeting (or its proxy) shall be required to bring their Account Holder Letter with Custody Instruction Reference Number or Medallion Signature Guarantee (as applicable) included and to register their attendance at the Scheme Meeting prior to its commencement. A passport shall be required as proof of personal identity to attend the Scheme Meeting and the passport number must match that on the Scheme Creditor's Account Holder Letter. If such personal identification is not produced, that person shall only be permitted to attend and vote at the Scheme Meeting at the discretion of the Chairman.

20. Any person appointed as proxy for a Scheme Creditor may attend and speak at the Scheme Meeting.

21. The Chairman shall be at liberty, but under no obligation, to permit the attendance of persons who are not entitled to attend and vote at the Scheme Meeting unless an objection is taken by (or by a person appointed to vote by proxy for) a Scheme Creditor, but such a person shall not be entitled to speak at the Scheme Meeting without the permission of the Chairman.

22. The Chairman shall be directed to file a report on the results of the Scheme Meeting, and the voting, prior to the application for sanction of the Scheme (assuming the requisite majority is obtained at the Scheme Meeting).

23. The Chairman and the Company shall be at liberty to apply for such further directions in this matter as may be necessary or appropriate.

24. If the Scheme is approved at the Scheme Meeting by the required statutory majority, the Claim Form shall be restored and a further Court hearing at which the Company shall seek the sanction by the Court of the Scheme shall take place on or around 29 January 2016.

25. Svitlana Romanova, the Chief Legal Officer for the Metinvest group of companies shall be appointed as foreign representative of the Company (the **Foreign Representative**) in any petition brought by the Company before the United States Bankruptcy Court for an order recognising the Scheme as a foreign proceeding and other related relief under Chapter 15 of the US Bankruptcy Code.

26. Pursuant to rule 5.4D(2) of the Civil Procedure Rules, notice shall be given to the Company of any application made by a person for permission under rule 5.4C of the Civil Procedure Rules to obtain a copy of a document from the court records in this matter.


The court has provided a sealed copy of this order to the serving party:

Allen & Overy LLP (ref: Mark Sterling)

One Bishops Square

London

E1 6AD

Tel: +44 (0) 20 3088 0000

**EXHIBIT C**

THE SCHEME

No.            of 2016

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
COMPANIES COURT

IN THE MATTER OF METINVEST B.V.

and

IN THE MATTER OF THE COMPANIES ACT 2006

───────────────────────

SCHEME OF ARRANGEMENT
(under Part 26 of the Companies Act 2006)

between

METINVEST B.V.

and

THE SCHEME CREDITORS
(as hereinafter defined)

## Table of Contents

**Clause**                                                                                                          **Page**

1.      Definitions and Interpretation ...................................................................................3
2.      Recitals............................................................................................................11
3.      The Scheme......................................................................................................13

Schedule

1.      Scheme Undertakings.........................................................................................21
2.      Form of Deed of Waiver and Release .....................................................................23

## 1.    DEFINITIONS AND INTERPRETATION

1.1    In this Scheme, unless inconsistent with the subject or context, the following expressions shall have the following meanings:

**2016 Notes** means the U.S.$500,000,000 (of which U.S.$85,238,250 remains outstanding) 10.25 per cent. guaranteed notes due 2016 issued by the Company (ISIN: XS0511379066, Common Code: 051137906, ISIN: US591555AA54, CUSIP: 591555AA5).

**2017 Notes** means the U.S.$289,734,000 10.50 per cent. guaranteed notes due 2017 issued by the Company (ISIN: XS1145219652, Common Code: 114521965, ISIN: US591555AC11, Common Code: 114752894, CUSIP: 591555 AC1).

**2018 Notes** means the U.S.$750,000,000 8.75 per cent. guaranteed notes due 2018 issued by the Company (ISIN: XS0591549232, ISIN: US591555AB38, CUSIP: 591555 AB3).

**Account Holder** means any person recorded directly in the records of a Clearing System as holding an interest in any Notes in an account with the relevant Clearing System either for its own account or on behalf of its client.

**Additional Scheme Consideration** means an amount of U.S.$1.25 per U.S.$1,000 principal amount of Notes held by each relevant Noteholder as at 5p.m. (New York time) on 1 April 2016.

**Business Day** means a day which is a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in Kyiv, Amsterdam, London and New York.

**Clearing Systems** means DTC, Clearstream, Luxembourg and Euroclear.

**Clearstream, Luxembourg** means Clearstream Banking, *société anonyme*.

**Common Depositaries** means Cede & Co. as nominee of DTC and The Bank of New York Mellon, London branch as the common depositary for Clearstream, Luxembourg and Euroclear, in each case with whom the Global Notes have been deposited.

**Companies Act** means the Companies Act 2006.

**Company** means Metinvest B.V. incorporated in the Netherlands as a private limited company (*besloten vennootschap met beperkte aansprakelijheid*) with trade register number 24321697 on 21 May 2001.

**Court** means the High Court of Justice of England and Wales.

**Declared Default** means:

(a)    any Event of Default arising under any of the Notes as a result of:

(i)    the failure by the Company and/or any of the Guarantors and/or any of their respective Subsidiaries to pay when due any Indebtedness in respect of:

3

(A)    any amount falling due under the PXF Facilities in the period from 1 January 2015 until 27 May 2016, inclusive  (a **PXF Payment Default**); or

(B)    any amount falling due under any Intra-group Facilities during the period from 1 January 2015 until 27 May 2016, inclusive (an **Intra-group Default**); or

(C)    any amount falling due under any of the Notes in the period from 31 January 2016 to 27 May 2016, inclusive (a **Notes Payment Default**); or

(D)    any amount falling due under the Seller Notes in the period from 31 January 2016 to 27 May 2016, inclusive (a **Seller Notes Payment Default**); or

(E)    any amount falling due under the Shareholder Loans in the period from 1 January 2015 to 27 May 2016, inclusive (a **Shareholder Loans Payment Default**); or

(ii)    the failure by the Company and/or any of the Guarantors and/or any of their respective Subsidiaries to pay when due any amounts payable under any guarantee for or indemnity in respect of Indebtedness referred to in sub-paragraph (i) above,

excluding any Event of Default occurring under Condition 8(c)(i) of the 2016 Notes, Condition 10(c)(i) of the 2017 Notes and Condition 10(c)(i) of the 2018 Notes  if, by reason of any PXF Payment Default, any Intra-group Default, any Notes Payment Default, Seller Notes Payment Default or any Shareholder Loans Payment Default, any lenders under the PXF Facilities or holders of the Seller Notes (or any agent or trustee on their behalf), any lenders under the Intra-group Facilities or the Shareholder Loans exercise their right under the PXF Facilities, the Intra-group Facilities, the Seller Notes or the Shareholder Loans (as applicable) to declare the loans made by them under the relevant Indebtedness to be due and payable prior to their stated maturity date;

(b)    any Event of Default arising under Condition 8(g)(i)(D) of the 2016 Notes, Condition 10(g)(i)(D) of the 2017 Notes or Condition 10(g)(i)(D) of the 2018 Notes as a result of any meeting of bondholders, lenders and other creditors of the Company, the Guarantors or any Material Subsidiary being convened for the purpose of considering an amicable settlement of their claims;

(c)    any Event of Default arising under Condition 8(g)(ii)(A) of the 2016 Notes, Condition 10(g)(ii)(A) of the 2017 Notes or Condition 10(g)(ii)(A) of the 2018 Notes as a result of the Company, Guarantors or any Material Subsidiary failing or being unable to pay its debts generally as they become due following the occurrence of any of the events set out in paragraph (a) of this definition;

(d)    any Event of Default arising under Condition 8(h) of the 2016 Notes, Condition 10(h) of the 2017 Notes or Condition 10(h) of the 2018 Notes in respect of Yenakiieve I&SW ceasing or threatening to cease to carry on all or substantially all of its business or operations; or

(e)    any Event of Default arising under Condition 8(b) of the 2016 Notes, Condition 10(b) of the 2017 Notes or Condition 10(b) of the 2018 Notes arising as a result of a breach by the Company or any of its Subsidiaries of Condition 3.2 of the 2016 Notes, Condition 4(c) of the 2017 Notes or Condition 4(b) of the 2018 Notes in connection with the Incurrence of any Indebtedness by

the Company or any of its Subsidiaries (directly or indirectly) under advance payment bonds, receivables financings, factoring financings, discounting transactions or any other trade finance or documentary facilities (other than letters of credit) incurred in the ordinary course of business provided that the aggregate total amount of such Indebtedness of the Company or any of its Subsidiaries outstanding at any one time does not exceed U.S.$600,000,000;

(f)     any Event of Default arising under either Condition 8(c) and 8(f) of the 2016 Notes, Condition 10(c) and 10(f) of the 2017 Notes or Condition 10(c) and 10(f) of the 2018 Notes or, in relation to paragraph (ii) below only, any Event of Default arising under Condition 8(d) of the 2016 Notes, Condition 10(d) of the 2017 Notes or Condition 10(d) of the 2018 Notes, as a result of:

(i)     a judgment in the amount of UAH 1,032,899,117.30 (equivalent to U.S.$43,428,882.31 as at 6 January 2016[1]) in favour of KRIOW against Ilyich I&SW for recovery of debt for supplied raw materials or any other court judgment connected with the relevant proceedings or such debt and a failure to pay such debt; or

(ii)    a judgment in the amount of UAH 276,021,884.71 (equivalent to U.S.$11,605,510.88 as at 6 January 2016) in favour of Yenakiieve I&SW for recovery of debt under an agency agreement or any other court judgment or enforcement proceedings connected with the relevant proceedings or such debt and a failure to pay such debt;

provided that the relevant judgments referred to in paragraphs (i) and (ii) above do not exceed, in the aggregate, an amount equivalent to U.S.$75,000,000 converted in accordance with the terms and conditions of the Notes; and

(g)     any Event of Default arising under any of the Notes as a result of a breach of Clause 7 by a Scheme Creditor.

**Deed of Waiver and Release** means the deed of waiver and release substantially in the form set out in Schedule 2 (Form of Deed of Waiver and Release).

**Determination Date** has the meaning given to that term in paragraph 5 of Schedule 1 (Scheme Undertakings).

**DTC** means The Depository Trust Company.

**DTC Participant** means a person recorded directly in the records of Cede & Co. and DTC as holding an interest in any Notes in an account held with DTC.

**Early Termination Date** has the meaning given to that term in Clause 21.

**Early Termination Date Notice** has the meaning given to that term in Clause 21.

**Euroclear** means Euroclear Bank S.A./N.V. as operator of the Euroclear clearing system.

---

[1]     Note: The conversion of UAH into U.S. dollars in paragraphs (f)(i) and (ii) of this definition is indicative only and is calculated on the basis of the official exchange rate of UAH against the U.S. dollar as quoted by the National Bank of Ukraine on 6 January 2016. However, Condition 8(f) of the 2016 Notes, Condition 10(f) of the 2017 Notes and Condition 10(f) of the 2018 Notes provide that the relevant calculations to determine the day when an Event of Default under such Conditions has occurred are to be made on the basis of the middle spot rate for the relevant currency against the U.S. dollar as quoted by any leading bank on such day).

**Event of Default** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Global Notes** has the meaning given to that term in Recital (C).

**Group** means the Company and its consolidated Subsidiaries.

**Guarantee** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Guarantors** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Ilyich I&SW** means Public Joint Stock Company Ilyich Iron and Steel Works of Mariupol (Ukraine), otherwise known as MMK Illycha.

**Incurred** and **Incurrence** have the meaning given to those terms in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Indebtedness** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Information Agent** means Lucid Issuer Services Limited.

**Intra-group Facilities** means any Indebtedness owing by the Company, any Guarantor or any Subsidiary of the Company or a Guarantor to any other member of the Group.

**Irish Stock Exchange** means the Irish Stock Exchange plc.

**KRIOW** means Public Joint Stock Company Krivoj Rog's Iron-Ore Combine (Ukraine), otherwise known as Public Joint Stock Company "Kryvyi Rih Iron Ore Works", a company organised and existing under the laws of Ukraine, identification code 00191307, whose registered office is at 1A Simbirtseva Street, Kryvyi Rih, Dnipropetrovsk Region, 50029 Ukraine.

**Liability** or **Liabilities** means any debt, liability or obligation of a person whether it is present, future, prospective or contingent, whether it is fixed or undetermined, whether or not it involves the payment of money or performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales or any other jurisdiction, or in any manner whatsoever.

**Longstop Date** means the date falling 10 days after the Scheme Effective Date.

**Majority Noteholder Request Notice** means a notice delivered to the Company by Noteholders in accordance with Clause 21 or paragraph 3 of Schedule 1 (Scheme Undertakings) (as applicable) pursuant to which Noteholders holding at least 50.01% of the aggregate principal outstanding amount of the Notes provide confirmations in writing to the Company as to their aggregate holdings of the Notes (accompanied by evidence as to such holdings from their custodians and/or Euroclear and Clearstream, Luxembourg in the form agreed between the Company and the legal and financial advisers to the Noteholder Committee, each acting reasonably).

**Material Subsidiary** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Monthly Report** has the meaning given to that term in paragraph 2 of Schedule 1 (Scheme Undertakings).

**Moratorium Period** means the period commencing on 31 January 2016 and ending on the Termination Date.

**Noteholder** means a person who is the beneficial owner of and/or the owner of the ultimate economic interest in any of the Notes as at the Record Date, whose interests in the Notes are held through records maintained in book entry form by a Clearing System.

**Noteholder Committee** means the ad-hoc committee of Noteholders formed on or about 25 September 2015 whose members include Ashmore Investment Management Limited, ICE Canyon LLC, Portland Worldwide Investments Ltd. and VR Advisory Services as general partner of VR Global Partners L.P. (in their own capacity or as agents, investment managers, investment advisers, to certain funds and/or managed accounts holding the Notes (as applicable)).

**Notes** means the 2016 Notes, the 2017 Notes and the 2018 Notes.

**Principal Trust Account** means any English law governed trust account to be established by the Company for the purposes of holding funds for the benefit of the Noteholders as contemplated by paragraph (e) of the definition of Termination Date.

**Proceeding** means any process, suit, action, legal or other proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, execution, distraint, restraint, forfeiture, re-entry, seizure, lien, enforcement of judgment or enforcement of any security.

**PXF Facilities** means:

(a)     a loan facility of up to U.S.$1 billion made available pursuant to a loan agreement originally dated 4 August 2011 (as subsequently amended) and arranged by Deutsche Bank AG, Amsterdam Branch and others;

(b)     a loan facility of up to U.S.$325 million made available pursuant to a loan agreement originally dated 25 May 2012 (as subsequently amended) and arranged by Deutsche Bank AG, Amsterdam Branch;

(c)     a loan facility of up to U.S.$560 million made available pursuant to a loan agreement originally dated 25 November 2012 (as subsequently amended) and arranged by Deutsche Bank AG, Amsterdam Branch; and

(d)     a facility of up to U.S.$300 million made available pursuant to a loan agreement originally dated 13 November 2013 (as subsequently amended) and arranged by Deutsche Bank AG, Amsterdam Branch and others.

**PXF Facility Suretyships** means each of the suretyships granted by Ilyich I&SW in favour of the PXF Lenders under each PXF Facility and pursuant to which Ilyich I&SW agrees, subject to limits, to guarantee the amounts owing to the PXF Lenders under the PXF Facilities.

**PXF Lenders** means the lenders participating in the PXF Facilities.

**Record Date** means 5 p.m. (New York time) on 22 January 2016.

**Registrar of Companies** means the Registrar of Companies of England and Wales.

**Released Parties** has the meaning given to that term in the Deed of Waiver and Release.

**Restricted Payment** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Restructuring** means the restructuring of the Company's obligations to its creditors (including the Noteholders and the PXF Lenders).

**Scheme** means this scheme of arrangement in respect of the Company under Part 26 of the Companies Act in its present form or with or subject to any modification, addition or condition approved or imposed by the Court or approved in accordance with the terms of this Scheme.

**Scheme Claim** means any claim in respect of any Liability of the Company to any person arising out of an interest in the Notes, arising on or before the Record Date or which may arise after the Record Date as a result of an obligation or Liability of the Company incurred or as a result of an event occurring or an act done on or before the Record Date (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such claims before or after the Record Date), excluding any Liability of the Company to the Trustees under the Trust Deeds other than in respect of the covenants to repay principal and interest on the Notes pursuant to the Trust Deeds.

**Scheme Consideration** means an amount of U.S.$1.25 per U.S.$1,000 principal amount of Notes held by each relevant Noteholder as at the Record Date.

**Scheme Creditor** means the Common Depositaries, the Trustees (solely in their capacities as the beneficiaries of the covenants to repay principal and interest on the Notes pursuant to the Trust Deeds) and the Noteholders.

**Scheme Effective Date** means the date on which an office copy of the order of the Court sanctioning this Scheme under Section 899 of the Companies Act has been delivered to the Registrar of Companies.

**Scheme Effectiveness Conditions** means that:

(a)     no breach of Condition 5.3A of the 2016 Notes or Condition 6(i) of the 2017 Notes and the 2018 Notes shall have occurred and be continuing as of the date the Scheme is sanctioned by the Court; and

(b)     the Company has published the Monthly Reports for the months of October 2015 and November 2015.

**Scheme Meeting** means the meeting of the Scheme Creditors to vote on this Scheme convened pursuant to an order of the Court (and any adjournment of such meeting).

**Scheme Undertaking** means an undertaking set out in Schedule 1 (Scheme Undertakings).

**Scheme Settlement Date** means the date on which the Scheme Consideration is paid by the Company in accordance with Clause 9.

**Seller Notes** means the seller notes issued on 30 April 2009 by United Coal Company LLC and Metinvest U.S., Inc. in connection with the acquisition by Metinvest U.S., Inc. of United Coal Company LLC which accrue interest at the rate of 7 per cent. per annum (as amended and restated on 10 January 2015).

**Settlement Date** has the meaning given to that term in paragraph 9 of Schedule 1 (Scheme Undertakings).

**Shareholder Loans** means the loans under the facility agreement between Rainwell Limited and the Company dated 3 April 2014 and the facility agreement between Eltrano Investments Ltd and the Company dated 3 April 2014.

**Subsidiary** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Surety Agreement** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Termination Date** means the earliest of:

(a)     27 May 2016;

(b)     the occurrence of an Early Termination Date;

(c)     the occurrence of an Undeclared Default;

(d)     the occurrence of a breach of a Scheme Undertaking which is not remedied within the period, if any, specified in Schedule 1 (Scheme Undertakings);

(e)     the date which is 10 days after the date on which any principal amount of the PXF Facilities is paid to the PXF Lenders (except as result of it becoming unlawful for any amount to remain outstanding to a PXF Lender) during the period commencing on 30 January 2016 to and including 27 May 2016 if, on or prior to the first mentioned date, the Company has not deposited in a Principal Trust Account an amount equal to such principal amount to be held on trust for the Noteholders in accordance with Clause 11;

(f)     the date on which the Company announces a rescheduling proposal which includes a write-off of any principal amount of the Notes outstanding as at 24 December 2015; and

(g)     the date on which the Company announces a rescheduling proposal which does not offer the same terms to all Noteholders (other than pursuant to the requirements of applicable mandatory securities laws).

**Trust Deed** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Trustee** means BNY Mellon Corporate Trustee Services Limited in its capacity as trustee under the relevant Trust Deed for each series of the Notes and any successor thereto as provided thereunder.

**Undeclared Default** means the occurrence of any Event of Default other than a Declared Default.

**Yenakiieve I&SW** means Public Joint Stock Company "Yenakiieve Iron and Steel Works" otherwise known as Public Joint Stock Company Enakievo Metallurgical Works (Ukraine), a company organised and existing under the laws of Ukraine, whose registered office is at 54 Ilyich Avenue, Building 4, Mariupol, Donetsk Region, 87504 Ukraine.

1.2   In this Scheme, unless the context otherwise requires or otherwise expressly provides:

(a)   references to Recitals, Clauses, Subclauses and Schedules are references to recitals, clauses, subclauses and schedules of this Scheme;

(b)   references to a person include a reference to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c)   references to a statute, statutory provision or regulatory rule or guidance include references to the same as subsequently modified, amended or re-enacted from time to time;

(d)   references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(e)   the singular includes the plural and *vice versa* and words importing one gender shall include all genders;

(f)   references to "including" shall be construed as references to "including without limitation" and "include", "includes" and "included" shall be construed accordingly;

(g)   headings to Recitals, Clauses, Subclauses and Schedules are for ease of reference only and shall not affect the interpretation of this Scheme;

(h)   references to a period of days shall include Saturdays, Sundays and public holidays and where the date which is the final day of a period of days is not a Business Day, that date will be adjusted so that it is the first following day which is a Business Day;

(i)   references to "Dollar", to "U.S.$" or to "$" are references to the lawful currency from time to time of the Unites States of America; and

(j)   references to time shall be to London time (Greenwich Mean Time or British Summer Time, as appropriate).

## 2.    RECITALS

**The Company**

(A)     Metinvest B.V. (the **Company**) was incorporated in the Netherlands as a private limited company (*besloten vennootschap met beperkte aansprakelijheid*) with trade register number 24321697 on 21 May 2001.

(B)     As at the date hereof, the authorised share capital of the Company is EUR 94,750 divided into 6,750 A shares; 2,251 B Shares; and 474 C shares of par value EUR 10 each, all of which have been issued and are fully paid up.

**Notes Issued by the Company**

(C)     The Notes are held under arrangements whereby:

　　(i)     the Notes have been constituted by the Trust Deeds with the trustee for each of the series being a Trustee;

　　(ii)     the Notes were issued wholly in global registered form, the global notes representing the Notes (the **Global Notes**) being held by the Common Depositaries;

　　(iii)     interests in the Notes while represented by the Global Notes are held by the Noteholders under systems designed to facilitate paperless transactions;

　　(iv)     the systems designed to facilitate paperless transactions involve interests in the Notes being held by Account Holders; each Account Holder may be holding interests in the Notes on behalf of one or more Noteholders; and

　　(v)     in the circumstances set out in the terms and conditions relating to the Notes, Noteholders may exchange their interests in any Note for definitive notes.

(D)     The Notes will remain in global form and will not be exchanged into definitive form under or pursuant to this Scheme.  References in this Scheme to Notes being held by a Noteholder shall be treated for all purposes as references to the interest held by the relevant Noteholder in the relevant Global Note.

**Scheme Consideration**

(E)     References in this Scheme to any Scheme Consideration or Additional Scheme Consideration being paid to a person shall be treated for all purposes as references to that person being paid directly or indirectly through one or more intermediaries the relevant Scheme Consideration or Additional Scheme Consideration in accordance with the rules and procedures of the relevant Clearing System.

**The Purpose of this Scheme**

(F)     The purpose of this Scheme is to effect a compromise and arrangement between the Company and the Scheme Creditors.

**The Notes and this Scheme**

(G)    The Scheme Creditors consist of:

       (i)     each of the Common Depositaries as a holder of one or more Global Notes and each of the Trustees solely in its capacity as the beneficiary of the covenant to repay principal and pay interest on the Notes pursuant to the relevant Trust Deed; and

       (ii)    the Noteholders as the beneficial owners of and/or persons with the ultimate economic interest in the Notes.

      Insofar as it relates to a Trustee, any reference in this Scheme to the Scheme Creditors authorising, directing or instructing a Trustee (whether on its own or as part of a wider group) will be treated for all purposes as an authorisation, direction or instruction of that Trustee in its capacity as a Scheme Creditor to that Trustee in its capacity as the trustee under the relevant Trust Deed to the extent that it is entitled to do so.

(H)    (i)     The Trustees have agreed not to vote in respect of the Notes at the Scheme Meeting;

       (ii)    The Bank of New York Mellon, London branch as the common depositary for Clearstream, Luxembourg and Euroclear has confirmed that it has not received, nor has it been requested to solicit, any instructions to vote from Clearstream, Luxembourg and Euroclear in respect of the Notes at the Scheme Meeting;

       (iii)   in accordance with its usual procedures, Cede & Co., in its capacity as nominee of DTC, has agreed to appoint the DTC Participants as its proxies for voting purposes under an omnibus proxy in respect of the principal amount of the Notes shown on its records as being held by the DTC Participants as at the Record Date. The DTC Participants are entitled to vote in respect of the Scheme or appoint sub-proxies to enable their votes and those of Noteholders who hold their Notes through DTC Participants in respect of the Scheme to be cast in respect of their recorded principal amount of Notes; and

       (iv)   Noteholders are entitled to vote at the Scheme Meeting in respect of each of their Notes (or, where applicable, are entitled to instruct their DTC Participant to appoint a sub-proxy to vote at the Scheme Meeting on their behalf). Noteholders have been invited to instruct their Account Holders (or sub-proxy, as applicable) as to how they wish to vote in respect of their Notes.

## 3.    THE SCHEME

**Application and Effectiveness of this Scheme**

1.      The compromises and arrangements effected by this Scheme shall apply to all Scheme Claims and bind all Scheme Creditors and their successors and assigns.

2.      If the Scheme Effectiveness Conditions have been satisfied (in the opinion of the Company, acting reasonably), this Scheme shall become effective in accordance with its terms on the Scheme Effective Date and all of the right, title and interest of Scheme Creditors to Scheme Claims shall be subject to the compromises and arrangements set out in this Scheme.  An office copy of the order of the Court sanctioning this Scheme under Section 899 of the Companies Act will not be delivered to the Registrar of Companies until the Scheme Effectiveness Conditions have been satisfied in accordance with this Clause.

3.      If the Scheme Settlement Date does not occur on or before the Longstop Date, the terms of and the obligations on the parties under or pursuant to this Scheme shall lapse and all the compromises and arrangements provided by this Scheme shall be of no effect.

4.      If the Early Termination Date Notice has not been given in accordance with Clause 21 and the Additional Scheme Consideration is not paid on or before 11 April 2016, the terms of and the obligations on the parties under or pursuant to this Scheme shall lapse and all the compromises and arrangements set out in this Scheme shall be of no further effect.

**Occurrence of the Scheme Settlement Date**

5.      It shall be a condition to the occurrence of the Scheme Settlement Date (and the actions to be taken pursuant to the terms of this Scheme on the Scheme Settlement Date) that the Scheme Effective Date has occurred.

6.      As soon as reasonably practicable after determining whether the Scheme Settlement Date has occurred, the Company shall give the Scheme Creditors notice by the issue of an announcement through the Clearing Systems and on the Scheme Website at www.lucid-is.com/metinvest.

**Moratorium in respect of Scheme Claims**

7.      During the Moratorium Period, subject to the terms of this Scheme each Scheme Creditor agrees not to, and in the case of a Scheme Creditor other than a Trustee agrees not to instruct any Trustee to (or agrees not to vote in favour of a resolution of Noteholders to instruct the Trustee to):

(a)      institute or continue any step, action or Proceedings (including, without limitation, any step, action or Proceedings referred to in conditions 8(d), 8(e) or 8(g) of the 2016 Notes, conditions 10(d), 10(e) or 10(g) of the 2017 Notes and conditions 10(d), 10(e) or 10(g) of the 2018 Notes or any proceedings under the laws of any relevant jurisdiction which have an analogous effect) against the Company, the Guarantors or any of their Subsidiaries to enforce the terms of any Trust Deed, any Surety Agreement, any Guarantees or any of the Notes; or

(b)     give written notice to the Company that any of the Notes are immediately due and payable or demand payment of any principal amounts under the Notes or any amount of interest which is not payable in accordance with the Scheme; or

(c)     make a demand under the terms of any Guarantee.

8.      Each Scheme Creditor agrees that:

(a)     any action (including any notice, request or direction made or given) taken in breach of Clause 7 shall be void and of no effect;

(b)     damages for breach of Clause 7 would be an inadequate remedy and consents to the Company seeking specific performance and/or injunctive relief to restrain any such breach; and

(c)     it waives any requirement on the Company to provide a cross-undertaking in damages in respect of any injunctive relief which the Company seeks to restrain a breach of Clause 7.

9.      In consideration of the agreement by the Scheme Creditors referred to in Clauses 7 and 8, the Company:

(a)     shall as soon as practicable following the occurrence of the Scheme Effective Date pay the Scheme Consideration and each Scheme Creditor shall be entitled to receive its share of the Scheme Consideration, in each case in accordance with and subject to the terms of this Scheme;

(b)     agrees that any amount of accrued but unpaid interest (which accrues from day to day) to and including the Termination Date to the extent unpaid shall be capitalised and added to the principal amount of the relevant Notes on the relevant Determination Date and, accordingly, shall bear interest in accordance with the terms and conditions of such Notes, and, further, that the aggregate amount of such capitalised interest (together with interest accrued thereon) shall be due and payable on the earlier of the Termination Date and the date a Restructuring is implemented and becomes effective; and

(c)     agrees, during the Moratorium Period (and, in relation to the payment of interest pursuant to paragraphs 5 and 6 of Schedule 1 (Scheme Undertakings) in respect of Determination Dates occurring on either the Early Termination Date or 27 May 2016, as applicable, until and including the relevant Settlement Date for such payment), to comply with the Scheme Undertakings.

10.     If the Early Termination Date Notice has not been given in accordance with Clause 21, the Company shall pay as soon as practicable on and following 1 April 2016 (and in any event prior to 11 April 2016) the Additional Scheme Consideration and each holder of Scheme Claims as at 5p.m. (New York time) on 1 April 2016 shall be entitled to receive its share of the Additional Scheme Consideration, in each case in accordance with and subject to the terms of this Scheme.

11.     Payment to the Principal Trust Account of any amount required by paragraph (e) of the definition of Termination Date will discharge the relevant payment obligations of the Company under that paragraph. The aggregate amount credited to the Principal Trust Account (together with any interest accrued thereon but net of any fees and charges) will be distributed to the Noteholders rateably in accordance with the principal amount of the holdings of their Notes as soon as practicable following the occurrence of the Termination Date.

**Instructions, Authorisations and Directions**

12. On the Scheme Effective Date, in consideration of the rights of the Scheme Creditors under this Scheme and notwithstanding any term of any relevant document, the Scheme Creditors:

   (a) hereby irrevocably direct each of the Trustees to execute and do, and to instruct any other person which it is entitled to instruct to execute and do, or otherwise procure to be executed and done, all documents, acts or things as may be necessary or desirable to be executed or done by it or such other person for the purposes of giving effect to the terms of this Scheme;

   (b) hereby irrevocably authorise the Company to execute and do, and to instruct any other person which it is entitled to instruct to execute and do, or otherwise procure to be executed and done, all documents, acts or things as may be necessary or desirable to be executed or done by it or such other person for the purposes of giving effect to the terms of this Scheme; and

   (c) hereby request and to the extent they are entitled to do so instruct the Company to perform each of its obligations arising under this Scheme.

13. The directions, instructions and authorisations granted under Clause 12 shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

**Grant of Authority**

14. Each of the Scheme Creditors hereby irrevocably authorises the Company on and from the Scheme Effective Date to enter into, execute and deliver as a deed (or otherwise) on behalf of that Scheme Creditor in its capacity as a Scheme Creditor (including any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Record Date) (to the extent applicable):

   (a) any document in connection with the actions described in Clauses 7, 8,  9, 10 and 11;

   (b) the Deed of Waiver and Release; and

   (c) any and all other documents that the Company reasonably considers necessary or desirable to give effect to the terms of this Scheme,

   for the purposes of giving effect to the terms of this Scheme. The authority granted under this Clause 14 shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

**Implementation of Arrangements**

15. If the Company reasonably considers it necessary or desirable to execute any document or documents to give effect to the terms of this Scheme on behalf of any of the Scheme Creditors on any day from (and including) the Scheme Effective Date to and (including) the expiry of the Moratorium Period, the Company shall execute such document or documents on behalf of the relevant Scheme Creditor pursuant to the authority granted under Clause 14.

16. On the Scheme Effective Date, the Company:

(a)     for itself and/or on behalf of each relevant Scheme Creditor pursuant to the authority granted under Clause 14 shall issue the directions described in Clause 12 and execute any document in connection with the actions described in Clauses 7, 8, 9, 10 and 11; and

(b)     shall execute the Deed of Waiver and Release on behalf of each Scheme Creditor pursuant to the authority granted under Clause 14.

17.     On the Scheme Settlement Date, the Company shall pay the Scheme Consideration in accordance with Clause 9.

18.     The payment of the Scheme Consideration, the payment of the Additional Scheme Consideration, if applicable, and the performance of its other obligations under this Scheme will discharge the Company's obligation to the Scheme Creditors under this Scheme.

19.     On and from the Scheme Effective Date (but subject to the other provisions of this Scheme) each Scheme Creditor shall be entitled to the rights and benefits accruing to that Scheme Creditor under this Scheme and all of the existing rights and benefits of the Scheme Creditors in respect of the Scheme Claims shall be subject and limited to the compromises and arrangements provided by this Scheme.

20.     Except as varied by the compromises and arrangements effected by this Scheme, the rights of all Scheme Creditors in respect of the Notes shall remain in full force and effect.

**Early Termination of the Scheme**

21.     Noteholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes may deliver to the Company a Majority Noteholder Request Notice between 15 March 2016 and 31 March 2016, inclusive, specifying that the compromises and arrangements under this Scheme shall terminate in accordance with this Clause 21 (the **Early Termination Date Notice**), in which case the Termination Date shall occur on the later of:

(a)     31 March 2016; and

(b)     the date falling 10 Business Days after receipt by the Company of the Early Termination Date Notice,

(the **Early Termination Date**).

**Payments in respect of interest owing under the Shareholder Loans**

22.     The Company is entitled to make payments in respect of interest owing under the Shareholder Loans which accrues but is unpaid during the Moratorium Period at any time on and following:

(a)     the date falling the day after the Early Termination Date if the Early Termination Date has occurred in accordance with Clause 21; and

(b)     28 May 2016, if the Early Termination Date has not occurred in accordance with Clause 21,

provided that in either case, the Company will not make any such payments (A) if any accrued interest under any of the Notes or the PXF Facilities is not paid in full and in cash in the amounts stipulated by the terms and conditions of the relevant Notes (together with any amounts capitalised under paragraph

9(b)) and (B) in excess of an aggregate amount of U.S.$2,300,000 for each month during the Moratorium Period.

**Record Date**

23.     All Scheme Claims shall be determined as at the Record Date.

**Assignments or Transfers**

24.     The Company shall be under no obligation to recognise any assignment or transfer of Scheme Claims after the Record Date for the purposes of determining entitlements under this Scheme, provided that the Company may, in its sole discretion and subject to the production of such other evidence as it may require and to any other terms and conditions which it may render necessary or desirable, recognise such assignment or transfer for the purposes of determining entitlements under this Scheme. It shall be a term of such recognition that the assignee or transferee of a Scheme Claim so recognised by the Company shall be bound by the terms of this Scheme and for the purposes of this Scheme shall be a Scheme Creditor.

**Costs**

25.     The Company shall pay, or procure the payment of, in full all costs, charges, expenses and disbursements incurred by it in connection with the negotiation, preparation and implementation of this Scheme as and when they arise, including, but not limited to, the costs of holding the Scheme Meeting, the costs of obtaining the sanction of the Court and the costs of placing the notices (if any) required by this Scheme.

26.     The Company shall pay, or procure the payment of, in full the costs, charges, expenses and disbursements reasonably incurred by the Common Depositaries and the Trustees in connection with the negotiation, preparation and implementation of this Scheme.

**Modifications**

27.     The Company may, at any hearing of the Court to sanction this Scheme, consent on behalf of all Scheme Creditors to any modification of this Scheme or any terms or conditions which the Court may think fit to approve or impose and which would not directly or indirectly have a material adverse effect on the interests of any Scheme Creditor under this Scheme.

**Obligations on dates other than a Business Day**

28.     If any sum is due or obligation is to be performed under the terms of this Scheme on a day other than a Business Day, the relevant payment shall be made, or obligation performed on the next Business Day.

**Notices**

29.    Any notice or other written communication to be given under or in relation to this Scheme (including any service of process in connection with a breach of Clause 7) (other than any Account Holder Letter or Sub-Proxy, which are to be delivered in accordance with the instructions contained therein) shall be given in writing and shall be deemed to have been duly given if it is delivered by hand, pre-paid first class post, airmail, fax or electronically to:

(a)    in the case of the Company:

Metinvest B.V.

Alexanderstraat 23, 2514 JM
The Hague, Netherlands
Telephone:     +31 70 36 40 900
Fax:              +31 70 36 35 795
Attention of:    Mr Ryzhenkov / Mr Kutepov

(b)    in the case of a Noteholder, either:

(i)    its last known address, fax number or email address according to the Company; or

(ii)    to the relevant Trustee for and on behalf of that Noteholder, at/on the contact details set out at Subclause (d) below.

(c)    in the case of the Common Depositaries:

Cede & Co.
55 Water Street
New York, NY 10041
United States

and

The Bank of New York Mellon
One Canada Square
London E14 5AL
Fax:              +44 207 964 4637
Copy to Fax:   +44 1202 689660
Attention:      Corporate Trust Administration (Metinvest)
Email:           CORPSOV2@bnymellon.com

(d)    in the case of the Trustees:

BNY Mellon Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom
Fax:              +44 20 7964 2536
Attention: Trustee Administration Manager (Metinvest B.V.)

(e)    in the case of the Information Agent:

Lucid Issuer Services Limited
Tankerton Works
12 Argyle Walk
London WC1H 8HA
Email:        metinvest@lucid-is.com
Phone:        020 7704 0880
Fax:          020 7067 9098

Attention of:    David Shilson / Thomas Choquet

(f)    in the case of any other person, any address, fax number or email address set forth for that person in any agreement entered into in connection with this Scheme or the last known address, fax number or email address according to the Company.

30.    Any notice or other written communication to be given under or in relation to this Scheme (other than any Account Holder Letter or Sub-Proxy, which are to be delivered in accordance with the instructions contained therein) shall be deemed to have been delivered and served:

(a)    if delivered by hand, when actually received provided that, if such receipt occurs after 5.00 p.m. in the place of receipt, the following Business Day;

(b)    if sent by pre-paid first class post or airmail, on the second Business Day after posting if the recipient is in the country of dispatch, otherwise the seventh Business Day after posting;

(c)    if sent electronically or by fax, when actually received in readable form provided that, if such receipt in readable form occurs after 5.00 p.m. in the place of receipt, the following Business Day; and

(d)    if by advertisement, on the date of publication.

31.    In proving service, it shall be sufficient proof, in the case of a notice sent by pre-paid first class post or airmail, that the envelope was properly stamped, addressed and placed in the post.

32.    The accidental omission to send any notice, written communication or other document in accordance with Clauses 29 to 30, or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Scheme.

33.    Notwithstanding any provision to the contrary contained in this Scheme:

(a)    while the Notes are represented by Global Notes and deposited with the Common Depositaries for the Clearing Systems, notice to the Noteholders may be given instead by delivery of the notice to the Clearing Systems and such notices shall be deemed to have been given to the Noteholders on the date of delivery to the Clearing Systems;

(b)    a Trustee may approve some other method of giving notice to the Noteholders of the relevant Notes if, in its opinion, that other method is reasonable having regard to market practice then prevailing and to the requirements of any stock exchange on which the relevant Notes are then

listed and provided that notice of that other method is given to the Noteholders in the manner required by that Trustee; and

(c)     a copy of each notice given in accordance with this Clause shall be provided to the Irish Stock Exchange for so long as the Notes are listed on the Irish Stock Exchange and the relevant regulations so require.

**Governing Law and Jurisdiction**

34.     The operative terms of this Scheme and any non-contractual obligations arising out of or in connection with this Scheme shall be governed by and construed in accordance with the laws of England and Wales. The Scheme Creditors hereby agree that the Court shall have exclusive jurisdiction to hear and determine any suit, action or Proceeding and to settle any dispute which arises out of or in connection with the terms of this Scheme or its implementation or out of any action taken or omitted to be taken under this Scheme or in connection with the administration of this Scheme and for such purposes the Scheme Creditors irrevocably submit to the jurisdiction of the Court, provided, however, that nothing in this Clause shall affect the validity of other provisions determining governing law and jurisdiction as between the Company and any of the Scheme Creditors, whether contained in contract or otherwise.

35.     The terms of this Scheme and the obligations imposed on the Company hereunder shall take effect subject to any prohibition or condition imposed by applicable law.

Dated this [●] day of January 2016

## SCHEDULE 1

## SCHEME UNDERTAKINGS

1.    The Company will procure that members of the Group will not make any payments in respect of capital expenditure in any calendar month in an aggregate amount greater than U.S.$28,000,000 (the **Monthly Capex Amount**) (provided that any part of any unspent Monthly Capex Amount may be carried forward and added to any future Monthly Capex Amount until utilised).

2.    The Company will provide a monthly report, in a form agreed with the legal and financial advisers to the Noteholder Committee (a **Monthly Report**), within 60 days of the last day of the calendar month (the **Delivery Date**) to which the Monthly Report relates. The first Monthly Report shall be in respect of the month of December 2015 and shall be published on the Company's website or before 29 February 2016. The Company shall not be in breach of this undertaking if it has provided the relevant Monthly Report within 5 calendar days following the applicable Delivery Date.

3.    On and after 1 April 2016 and provided that the Early Termination Date has not occurred in accordance with Clause 21 of the Scheme, if requested to do so by a Majority Noteholder Request Notice, the Company will publish its latest proposal of the terms of a Restructuring within 15 days of receipt of such Majority Noteholder Request Notice.

4.    The Company will not make, and will not permit any Subsidiary to make, any Restricted Payment or any payment of principal owing in respect of any Shareholder Loans.

5.    Subject to paragraph 9 below, the Company will pay to the Noteholders and the PXF Lenders (as applicable) an amount equal to 30% of accrued and unpaid interest (whether or not then due and payable under the relevant terms and conditions of the Notes or the terms of the PXF Facilities) under the Notes and the PXF Facilities up to but excluding the first Determination Date, and subsequently from the last Determination Date to but excluding the next Determination Date. **Determination Date** shall mean each of the following:

(a)    31 January 2016;

(b)    15 February 2016;

(c)    15 March 2016;

(d)    the Early Termination Date, if this has occurred in accordance with Clause 21 of the Scheme; and

if the Early Termination Date has not occurred:

(e)    15 April 2016; and

(f)    27 May 2016;

(such amounts being **Cash Pay Interest Amounts**).

6.  In addition to the Cash Pay Interest Amounts and subject to paragraph 9 below, the Company will pay an amount equal to the difference (if positive) between (x) the average of unrestricted cash balances (as determined in good faith by the Company) as of the close of business on Friday of each of the four weeks immediately preceding the relevant Determination Date and (y) U.S.$180,000,000, in respect of interest (other than Cash Pay Interest Amounts) accrued and unpaid under the Notes and the PXF Facilities (whether or not then due) up to but excluding the relevant Determination Date. Such amount shall be allocated and paid pro rata to the amounts of interest (other than Cash Pay Interest Amounts) accrued and unpaid (whether or not then due) under the Notes and the PXF Facilities (subject to rounding).

7.  The Company will not make any payment in respect of interest owing under any of the PXF Facilities in amounts additional to those contemplated under paragraphs 5 and 6 above, unless any such additional payment is made in respect of the Notes and the PXF Facilities pro rata to the amounts of interest then accrued and unpaid under the Notes and the PXF Facilities and on the Settlement Dates.

8.  Subject to Clause 22 of the Scheme, the Company will not make any payment in respect of interest owing under the Shareholder Loans.

9.  The interest payable pursuant to paragraphs 5 and 6 above shall be due and payable on date falling 5 Business Days following the Friday immediately prior to the occurrence of each Determination Date (the **Settlement Date**), provided that:

    (a)  no Termination Date under paragraph (d) of the definition of Termination Date shall occur by reason of any breach by the Company of its obligations under paragraphs 5 and 6 above if the Company remedies such breach of its obligations within 10 calendar days of the relevant Settlement Date; and

    (b)  if the relevant paying agents under the Notes (the **Paying Agents**) refuse or are unable to process all or part of the payments of due and/or accrued interest under the Notes referred to in paragraphs 5 and 6 above (such unpaid amount being the **Relevant Interest Amount**) as contemplated above, the Company will deposit in an English law governed trust account (the **Interest Trust Account**) an amount equal to the Relevant Interest Amount to be held on trust for the Noteholders within 10 calendar days of the relevant Settlement Date. Payment of the Relevant Interest Amount to the Interest Trust Account will discharge the payment obligations of the Company under paragraphs 5 and 6 above in respect of the Relevant Interest Amount. The aggregate amount credited to the Interest Trust Account (net of any fees and charges) will be distributed to the applicable Noteholders in accordance with their entitlements under paragraphs 5 and 6 above as soon as practicable following the earlier of (i) the date the Paying Agents confirm to the Company that they will process the applicable Relevant Interest Amount and (ii) the Termination Date; and

    (c)  during the Moratorium Period, interest payments under the Notes shall be due solely on the relevant Settlement Dates and no interest shall be payable under the Notes on any other dates specified in the relevant terms and conditions of the Notes.

10.  The Company will procure as a term of the Scheme that Ilyich I&SW will provide a suretyship by deed poll in favour of the Noteholders on a pari passu basis with (and subject to the same limits as) the PXF Facility Suretyships on or before 14 March 2016.

**SCHEDULE 2**

**FORM OF DEED OF WAIVER AND RELEASE**

# DEED OF WAIVER AND RELEASE

**DATED [●] 2016**

by

**THE SCHEME CREDITORS**

in favour of

**THE RELEASED PARTIES**

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Interpretation | 25 |
| 2. | Waiver and Release | 26 |
| 3. | Further Assurances | 26 |
| 4. | Contracts (Rights of Third Parties) Act | 26 |
| 5. | Counterparts | 27 |
| 6. | Governing Law and Jurisdiction | 27 |

**Appendix 1**

| 1. | Released Parties | | 28 |
|---|---|---|---|
| | Part 1 | Transaction Released Parties | 28 |
| | Part 2 | Adviser Released Parties | 29 |

Signatories .......................................................................................................................30

**THIS DEED** is dated [●] 2016 and is made by:

(1)    **THE SCHEME CREDITORS** (as defined below), acting by an authorised officer of Metinvest B.V. (the **Company**) pursuant to the authority conferred upon the Company by the Scheme Creditors under Clause 14 of the Scheme (as defined below),

In favour of:

(2)    **THE RELEASED PARTIES** (as defined below).

**BACKGROUND**

(A)    The Company has entered into the Scheme with the Scheme Creditors.

(B)    The Company is authorised, under Clause 14 of the Scheme, to execute and deliver this Deed on behalf of each of the Scheme Creditors.

(C)    It is intended that this document takes effect as a deed notwithstanding the fact that a party may only execute this document under hand.

**IT IS AGREED** as follows:

**1.    INTERPRETATION**

**1.1    Definitions**

In this Deed:

**Adviser Released Party** means the persons listed at Part 2 of Appendix 1 of this Deed.

**Released Parties** means the Adviser Released Parties and the Transaction Released Parties.

**Scheme** means the scheme of arrangement pursuant to Part 26 of the Companies Act 2006 between the Company and the Scheme Creditors as sanctioned by the Court on or about the date of this Deed.

**Scheme Creditor** means the Common Depositaries, the Trustees (solely in their capacities as the beneficiaries of the covenants to repay principal and interest on the Notes pursuant to the Trust Deeds) and the Noteholders.

**Transaction Released Parties** means the persons listed at Part 1 of Appendix 1 of this Deed.

**1.2    Construction**

(a)    Capitalised terms defined in the Scheme have, unless expressly defined in this Deed, the same meaning in this Deed.

(b)    In this Deed, unless the context otherwise requires or otherwise expressly provides:

(i)    references to Clauses are references to Clauses of this Deed;

(ii)     references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(iii)    references to a statute or statutory provision include references to the same as subsequently modified, amended or re-enacted from time to time;

(iv)     the singular includes the plural and vice versa and words importing one gender shall include all genders; and

(v)      headings to Clauses are for ease of reference only and shall not affect the interpretation of this Deed.

## 2.       WAIVER AND RELEASE

2.1      With effect from the Scheme Effective Date and without prejudice to the provisions of the Scheme, the Scheme Creditors (on their own behalf and on behalf of any person to whom they may have transferred their Scheme Claims after the Record Date) hereby irrevocably and unconditionally:

(a)      waive, release and discharge fully and absolutely all Liabilities of the Released Parties to the Scheme Creditors in relation to or in connection with or in any way arising out of the preparation, negotiation or implementation of the Scheme; and

(b)      waive each and every claim which the Scheme Creditors (or any person to whom a Scheme Creditor may have transferred its Scheme Claim after the Record Date) may have in relation to or in connection with or in any way arising out of the preparation, negotiation or implementation of the Scheme against the Released Parties.

2.2      Each release, waiver and discharge effected by the terms of Clause 2.1 above shall not extend to:

(a)      any Liability of any Adviser Released Party arising under or relating to a duty of care to such Adviser Released Party's client or arising under a duty of care to another person which has been expressly accepted or acknowledged in writing by that Adviser Released Party; and

(b)      any Liability arising out of or resulting from gross negligence, wilful default or fraud (or any claim relating to such Liability).

## 3.       FURTHER ASSURANCES

The Scheme Creditors will take whatever action is reasonably necessary to achieve the waiver, release and discharge referred to in Clause 2 (Waiver and Release).

## 4.       CONTRACTS (RIGHTS OF THIRD PARTIES) ACT

4.1      Other than as provided in Clause 4.2 below, a person who is not party to this Deed has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Deed.

4.2      A Released Party may rely on and enforce the terms of this Deed.

5. **COUNTERPARTS**

This Deed may be executed in any number of counterparts.  This has the same effect as if the signatures on the counterparts were on a single copy of the Deed.

6. **GOVERNING LAW AND JURISDICTION**

This Deed and any non-contractual obligations arising out of or in connection with it are governed by English law. The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed or any non-contractual obligations connected with it.

This Deed has been entered into and delivered as a deed on the date stated at the beginning of this Deed.

**APPENDIX 1**

**RELEASED PARTIES**

**PART 1**

**TRANSACTION RELEASED PARTIES**

1.      The Company and its directors, members and representatives.

2.      BNY Mellon Corporate Trustee Services Limited in its capacity as trustee for each series of Notes.

3.      The Bank of New York Mellon in its capacity as paying agent for each series of the Notes.

4.      Each Common Depositary.

5.      Each member of the Noteholder Committee named in the definition of Noteholder Committee in Clause 1.1 of the Scheme.

**PART 2**

**ADVISER RELEASED PARTIES**

1.      Rothschild & Cie.

2.      Allen & Overy LLP.

3.      Baker & McKenzie LLP and all other member firms of Baker & McKenzie International, a Swiss Verein.

4.      Deloitte LLP.

5.      Linklaters LLP.

6.      PJT Partners (UK) Limited.

7.      The Blackstone Group International Partners LLP

8.      Hogan Lovells International LLP.

## SIGNATORIES

**SCHEME CREDITORS**

| | |
|---|---|
| EXECUTED AND DELIVERED AS A DEED by | ) |
| **METINVEST B.V.** | ) |
| | ) |
| acting pursuant to the authority conferred on Metinvest B.V. | ) |
| for this purpose under the Scheme | ) |

acting by

Authorised Signatory

in the presence of

**EXHIBIT D**

Prof. S. Lubben
First
Exhibit SL1

No.                of 2016

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTER OF METINVEST B.V.**

**AND**

**IN THE MATTER OF THE COMPANIES ACT 2006**

<u>**EXPERT REPORT OF PROFESSOR STEPHEN J. LUBBEN ON**
**CHAPTER 15 OF THE UNITED STATES BANKRUPTCY CODE**</u>

## Table of Contents

I.      INTRODUCTION AND SUMMARY OF REPORT ...................................................3

II.     QUALIFICATIONS OF AUTHOR...........................................................................4

III.    INDEPENDENCE OF AUTHOR ..............................................................................5

IV.     METINVEST AND THE PROPOSED SCHEME OF ARRANGEMENT................5

V.      THE UNITED STATES BANKRUPTCY CODE AND CHAPTER 15 ....................8

VI.     THE PROPOSED SCHEME AND CHAPTER 15 ..................................................14

VII.    OPINION AND CERTIFICATIONS........................................................................16

EXHIBIT A (AUTHOR'S CV)...........................................................................................18

I, **PROFESSOR STEPHEN J. LUBBEN, WILL SAY** as follows:

## I.    Introduction and Summary of Report

I have been retained by Allen & Overy LLP ("Allen & Overy") on behalf of Metinvest B.V. ("Metinvest"), acting out of its London branch, to provide an expert opinion and report addressing the question of whether the bankruptcy courts in the United States of America would recognize a proposed scheme of arrangement to be put forth by Metinvest under Part 26 of the English Companies Act 2006, and give effect to the terms of such scheme of arrangement (hereinafter, the "Scheme").  In connection with this matter Metinvest's counsel, Allen & Overy, has instructed me.

In preparing this report, I reviewed the following documents:

- Various documents summarizing the Scheme, prior negotiations amongst Metinvest and its creditors, and Metinvest and its affiliates' capital structure and operations, all prepared by Allen & Overy.
- Drafts of the Scheme, and the Practice Statement Letter related thereto.
- An Offering Memorandum, dated May 18, 2010, for $500 million in 10.25 percent Guaranteed Notes due 2015, of which I am told just over $85 million remain outstanding and for which the maturity date is now January 31, 2016 (the "2016 Notes").[1]
- A Trust Deed, dated May 20, 2010, related to the 2016 Notes (the "2016 Trust Deed").
- A Base Offering Memorandum, dated October 20, 2014, for the $1.5 billion Guaranteed Medium Term Note Program, under which I am told Metinvest has issued approximately $290 million 10.50 percent Guaranteed Notes due 2017 (the "2017 Notes").
- An Amended and Restated Trust Deed, dated October 20, 2014, related to the 2017 Notes (the "2017 Trust Deed").
- A Base Offering Memorandum, dated February 11, 2011, for the $1 billion Guaranteed Medium Term Note Program, under which I am told Metinvest has issued approximately $750 million 8.75 percent Guaranteed Notes due 2018 (the "2018 Notes").
- A Trust Deed, dated February 11, 2011, related to the 2018 Notes (the "2018 Trust Deed").
- A Consent Solicitation Memorandum, dated May 7, 2015, related to the 2016 Notes.
- A Consent Solicitation Memorandum, dated May 7, 2015, related to the 2017 Notes.
- A Consent Solicitation Memorandum, dated May 7, 2015, related to the 2018 Notes.

---

[1] Throughout this Report, all dollar signs indicate USD.

3

At the outset, the reader should be aware of the following qualifications or limitations of this opinion:

- The report has been prepared solely for the use of Metinvest, its affiliates, and the Court, and solely for the purpose of assisting in determining whether the Scheme should be sanctioned and recognized under chapter 15 of the United States Bankruptcy Code. I accept no duty to any other party and shall not be liable for any loss or expense of any nature that is caused by any other party's reliance on the report.

- In conducting my analysis, I assume the applicability of general principles of United States law and the United States Bankruptcy Code, and I make no specific inquiry into, and express no opinion with respect to, the laws of any other jurisdiction, save with respect to the interaction of the English Companies Act 2006 and American law.

As set forth herein, assuming certain procedural requirements are met, I conclude that the Scheme will be recognized in the United States as a foreign nonmain proceeding under chapter 15 of the United States Bankruptcy Code. Such recognition will then allow the American court to enter orders in support of the Scheme.

## II.    Qualifications of Author

I hold the Harvey Washington Wiley Chair in Corporate Governance & Business Ethics at Seton Hall University School of Law in Newark, New Jersey. I have been in academia since summer 2002, and teach classes in Corporate Finance, Bankruptcy, and Financial Institutions, among others.

I am the author of the law school textbook *Corporate Finance*, published by Wolters Kluwer in the Fall of 2013. I am a contributing author of the *Bloomberg on Bankruptcy* legal treatise. I was also the author of the American Bankruptcy Institute's *Chapter 11 Professional Fee Study*, the largest empirical study of professional compensation in chapter 11 corporate bankruptcy cases ever undertaken.

I have been widely quoted in the press, at home and abroad, as an expert on American corporate bankruptcy law, and write a regular column on these matters for the *New York Times'* Dealbook business page.[2] I am also a regular contributor to *Credit Slips*,[3] a blog started by a small group of bankruptcy experts, and my writings therein have been favorably cited by bankruptcy courts in the United States.[4]

---

[2] http://www.nytimes.com/column/dealbook-in-debt
[3] http://www.creditslips.org
[4] In re Gen. Motors Corp., 407 B.R. 463, 502 (Bankr. S.D.N.Y. 2009) ("Thus, as Lubben suggests, and the Court agrees …"), *aff'd*, In re Motors Liquidation Co.,

I am an elected fellow of the American College of Bankruptcy and an invited member of the International Insolvency Institute, and have spoken on insolvency and corporate finance matters throughout Europe and North America. I frequently advise government officials and international agencies on potential legislative reforms, and I have testified before the United States Congress and the TARP Congressional Oversight Panel on corporate bankruptcy and finance matters.

I am a member of the New York and California state bars; and before entering academia I practiced as an associate in the New York and Los Angeles offices of Skadden, Arps, Slate, Meagher & Flom LLP, where I represented parties in large chapter 11 cases throughout the United States, many of which involved transnational issues.

A copy of my full curriculum vita is attached hereto as Exhibit A.


### III.    Independence of Author

I have been engaged by Metinvest's counsel Allen & Overy. I have been engaged by Allen & Overy in the past, in unrelated matters. But I, and the members of my immediate family, have no other connection with either Allen & Overy or Metinvest and its affiliates. My immediate family and I also have no known connection with Metinvest's ultimate shareholders or their affiliates.


### IV.    Metinvest and the Proposed Scheme of Arrangement

The facts and matters set out in this section IV, upon which my expert opinion is based, have been provided to me by Allen & Overy, or are based on my review of documents provided by Allen & Overy.

#### a.    Metinvest's Operations and Structure

Metinvest is a holding company, incorporated in the Netherlands. Metinvest and its subsidiaries (collectively, the "Group") operate as a large, vertically integrated mining and steel business. The Group has operations throughout the world,

---

430 B.R. 65 (S.D.N.Y. 2010). *See also* Franklin California Tax-Free Trust v. Puerto Rico, No. 15-1218, 2015 WL 4079422, at *4 (1st Cir. July 6, 2015) (citing Stephen J. Lubben, *Puerto Rico and the Bankruptcy Clause*, 88 Am. Bankr. L.J. 553, 572 (2014)); In re ASARCO, L.L.C., 702 F.3d 250, 261 n.10 (5th Cir. 2012) (citing Stephen J. Lubben, *The Chapter 11 Financial Advisors,* 28 Emory Bankr. Dev. J. 11, 27–28 (2011)); In re Washington Mut., Inc., 419 B.R. 271, 280 (Bankr. D. Del. 2009) (citing Stephen J. Lubben, *Credit Derivatives and the Future of Chapter 11*, 81 Am. Bankr.L.J. 405, 407 (2007)).

including coal mining operations in the American states of West Virginia, Kentucky, and Tennessee.[5]

In the United Kingdom, Metinvest operates through three direct and indirect wholly-owned subsidiaries: Spartan UK Limited, Metinvest Investments Limited, and Metinvest Capital UK Limited. Spartan is a steel plate producer located in Newcastle, where it employs more than 100 people.[6] According to a recent press report, "Spartan steel products end up in 'yellow goods' like excavators, towers for wind turbines, and even Arsenal FC's Emirates Stadium."[7]

Metinvest itself operates in part through a branch office in the United Kingdom (the "UK Branch"). The UK Branch is registered with Companies House, and Metinvest leases an office at 25 Park Lane, London, which includes office equipment, computers, and various telecommunications systems to integrate the UK Branch with the Group and its global customer base.

An employee of the Group at the UK Branch provides certain corporate finance and treasury services and additional services overseeing the restructuring and ongoing management of Metinvest's debt.

A meaningful portion of the Group's assets are located in Ukraine and have been affected by the ongoing civil disturbances and military action in that country. In addition, prices for steel products, coal, and iron ore declined significantly throughout 2014 and 2015. These broader market trends, combined with events in Ukraine, are the key source of Metinvest's financial difficulties.

### b. Metinvest's Capital Structure

Metinvest has pre-export finance loan facilities (the "PXF Facilities") with four syndicates of international banks (the "PXF Lenders"). Various Group members have granted bank account pledges or sales proceeds security assignments in support of the PXF Facilities. An operating subsidiary of the Group has also granted a suretyship in respect of each PXF Facility. Each of the PXF Facilities is governed by English law.

Earlier this year Metinvest was unable to make payments due under the PXF Facilities. On 1 December 2015, Metinvest entered into a contractual standstill arrangement (the "PXF Standstill") with certain PXF Lenders that provides that those lenders will not take any enforcement action or commence insolvency proceedings until late January 2016.

Metinvest also has three outstanding series of notes, which are the subject of the present Scheme. The 2016 Notes originally fell due on May 20, 2015, but are

---

[5] http://www.metinvestholding.com/en/about/contact.
[6] http://spartan.metinvestholding.com/en
[7] http://www.chroniclelive.co.uk/business/business-news/losses-widen-gateshead-steel-milling-10022590

now due at the end of January 2016, as a result of a consent solicitation conducted in May of this year.  The 2017 Notes are due and payable in four equal installments beginning in May 2016 and continuing through November 2017. The 2018 Notes are due in February of that year.

There is presently more than $1.1 billion in outstanding notes.  The notes are unsecured and are guaranteed by certain Metinvest operating subsidiaries.

All three series of notes are overseen by a trustee based in Canary Wharf, London.  Under each series of notes, Metinvest has agreed to appoint an agent for service of process within England.[8]

All of the notes are governed by English law,[9] and the trust deeds and suretyships associated with the notes are also governed by English law.[10] Ultimately, every aspect of the notes is governed by English law.[11]  Indeed, if there is a dispute over the trustee's compensation, it is to be decided by an expert selected by the President of The Law Society of England and Wales.[12]

The 2017 Notes, as well as the 2018 Notes, are governed by arbitration clauses calling for arbitration "under the London Court of International Arbitration, Arbitration Rules" and providing that the location of any arbitration "shall be London, England and the language of the arbitration shall be English."[13]

---

[8] 2016 Notes Offering Memorandum, page 205, section 18(d); 2017 Notes Offering Memorandum, page 241, section 19(c); 2018 Notes Offering Memorandum, page 237, section 19(d).  *See also* 2016 Trust Deed, page 57 (terms and conditions of notes).

[9] 2016 Notes Offering Memorandum, page 205, section 18(a); 2017 Notes Offering Memorandum, page 241, section 19(a); 2018 Notes Offering Memorandum, page 236, section 19(a).

[10] 2016 Trust Deed section 16.1, page 20; 2017 Trust Deed section 19.1, page 26; 2018 Trust Deed section 19.1, page 24.

[11] For example, reading through the 2017 Trust Deed, we find that not only is the trust deed itself to be governed by English law, but the Temporary Global Note (page 32), the Permanent Global Note (page 40), the Restricted Global Note (page 49), the Unrestricted Global Note (page 55) all contain their own English choice of law clause.  And consistent with the 2017 Notes Offering Memorandum, the terms of the 2017 Notes as set forth in the exhibit to the 2017 Trust Deed also provide that the notes, and all related documents, shall be governed by English law (page 111).  Whenever there is a choice of law clause in connection with the three series of notes, English law is the specified choice.

[12] *E.g.*, 2016 Trust Deed section 7.2, page 11.

[13] 2017 Notes Offering Memorandum, page 241, section 19(b); 2018 Notes Offering Memorandum, page 236, section 19(b).

Under the 2016 Notes and the 2018 Notes, the trustee has the option of proceeding by way of litigation, in place of arbitration. In connection with this option, the Group has irrevocably submitted to jurisdiction in England.[14]

Metinvest's counsel with respect to both English and American law for all three note issuances was the London office of Baker & McKenzie LLP. This same firm and office represented Metinvest during the May 2015 consent solicitations.

### c. The Scheme

The Scheme aims to effectuate a standstill agreement, broadly comparable to the PXF Standstill between Metinvest and the noteholders. It is anticipated that this standstill will last until May 27, 2016, with an ability of a majority of the noteholders to terminate the standstill agreement on March 31, 2016 by notice to Metinvest, or 10 business days following receipt of the termination notice, whichever is later. The Group also expects to negotiate an extension of the PXF Standstill on similar terms. Taken together, the Scheme and the PXF Standstill, when amended and extended as envisioned, will provide sufficient time and "breathing space" for the Group to negotiate a comprehensive restructuring of its capital structure. Specifically, I am told that Metinvest seeks to reschedule the maturities of the notes and the PXF Facilities.

I understand from Allen & Overy that the Chief Legal Officer and Member of the Executive Committee of Metinvest Holding, LLC (a Group member) will be appointed as the "foreign representative" and Metinvest will then seek recognition of the Scheme under American law. The rights of all other creditors of the Metinvest corporate group, save the noteholders (and other scheme creditors including the trustees and the common depositaries), would remain unaffected by the Scheme.

In essence the Scheme is a device for preventing would-be "holdout" noteholders from upending the ongoing negotiations between Metinvest, the PXF Lenders, and a majority of the noteholders.

### V.    The United States Bankruptcy Code and Chapter 15

The United States is a federal system, under which the state governments retain full sovereignty except as expressly preempted by the terms of the United States Constitution. Under Article I, section 8, clause 4 of the United States Constitution, the federal Congress is given the power "To... establish... uniform Laws on the subject of Bankruptcies throughout the United States."

Thus the United States Bankruptcy Code is a federal statute, enacted by the Congress, and applied in the federal court system.[15]  Contract law, however,

---

[14] 2016 Notes Offering Memorandum, page 205, section 18(c), 2018 Notes Offering Memorandum, page 236-37, section 19(c).

remains with the states.  And the Supreme Court long ago recognized that the law applicable to any specific contract includes all insolvency and restructuring procedures in place in the jurisdiction where the contract was signed, at the time the contract was executed.[16]

The federal Bankruptcy Code is set up with chapters of general applicability, such as chapters 1, 3, and 5.  Then there are chapters of specific applicability, such as the well-known chapter 11, for corporate reorganization.

Of key relevance for present purposes is chapter 15 of the Bankruptcy Code.

Chapter 15 is based on the United Nations Commission for International Trade Law's Model Law on Cross Border Insolvency.  It was enacted to promote the objectives set forth in section 1501 of the Code, including:

- Enhancing cooperation between U.S. and foreign courts,

- Promoting greater legal certainty for trade and investment,

- Supporting fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested parties, and

- Facilitating the rescue of financially troubled businesses.

The recognition of foreign proceedings is governed by sections 1515 through 1524.

Within chapter 15, section 1517(a) provides that, after notice and hearing, a court shall enter an order recognizing a foreign proceeding as a foreign main proceeding or foreign nonmain proceeding if:

1) the foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code,
2) the foreign representative applying for recognition is a person or body, and
3) the petition meets the requirements of section 1515 of the Bankruptcy Code.[17]

Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

---

[15] Bankruptcy Reform Act of 1978, Pub. L. No. 95-589, 92 Stat. 2549 (codified as amended at 11 U.S.C. §§ 101–1524).
[16] Ogden v. Saunders, 25 U.S. 213 (1827) (contract was properly discharged under New York state law proceeding, and such proceeding did not offend federal bankruptcy powers).
[17] In re Kemsley, 489 B.R. 346, 358 (Bankr. S.D.N.Y. 2013).

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

The definition includes proceedings addressing both solvent and insolvent debtors.[18]  Since Congress' 2005 enactment of chapter 15, U.S. courts have recognized schemes of arrangement from the United Kingdom as "foreign proceedings" on numerous occasions.[19]  This makes perfect sense, inasmuch as a scheme of arrangement meets the section 101(23) requirements by being a collective proceeding, facilitating an adjustment of debt, where the affairs of the debtor-company are under the supervision of the High Court of Justice of England and Wales, for the purpose of reorganizing the debtor.

Section 1517(b)(2) of the Code provides that a *foreign nonmain proceeding* is a *foreign proceeding* pending in a country where the debtor has an *establishment* within the meaning of section 1502.[20]  Section 1502(2) in turn defines *establishment* as "any place of operations where the debtor carries out a nontransitory economic activity."[21]

Whether an establishment exists is "essentially a factual question, with no presumption in its favor."[22]

According to the UNCITRAL Legislative Guide on Insolvency Law, an establishment is "a place of business, which is not necessarily the center of main interests."[23]  Similarly, caselaw on the definition of establishment has tended to

---

[18] In re Millard, 501 B.R. 644, 650 (Bankr. S.D.N.Y. 2013).

[19] *E.g.,* In re Towergate Finance, No. 15-10509 (Bankr. S.D.N.Y. Mar. 27, 2015); In re Zodiac Pool Solutions SAS., No. 14-11818 (Bankr. D. Del. Aug. 29, 2014); New World Resources N.V., No. 14-12226 (Bankr. S.D.N.Y. July 30, 2014); In re Zlomrex Int'l Finance S.A., No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014); In re Magyar Telecom B.V., Case No. 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013); In re Tokio Marine Europe Ins. Ltd., Case No. 11-13420 (Bankr. S.D.N.Y. July 18, 2011); In re Global Gen. and Reinsurance Co. Ltd., Case No. 11-10327 (Bankr. S.D.N.Y. Jan. 31, 2011); In re Hellas Telecom. (Luxembourg) V, Case No. 10-13651 (Bankr. D. Del. Dec. 13, 2010); In re Castle Holdco 4, Ltd., Case No. 09-11761 (Bankr. S.D.N.Y. April 2, 2009).

[20] 11 U.S.C. § 1517(b)(2).

[21] 11 U.S.C. § 1502(2).

[22] In re Ran, 607 F.3d 1017, 1026 (5th Cir. 2010).

[23] http://www.uncitral.org/pdf/english/texts/insolven/05-80722_Ebook.pdf, at page 42.

collapse the analysis into the simple question of whether the debtor has a "local place of business" in the jurisdiction in question.[24]

Perhaps more helpfully, other courts have stated that a petitioning firm must show "a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property."[25] Stated conversely, given "a proceeding in a country which a debtor's only connection was a transitory activity, such proceeding is not entitled to recognition under chapter 15."[26] But when the debtor conducts any enduring economic activity in the jurisdiction, a restructuring proceeding in that jurisdiction is at least entitled to recognition as a foreign nonmain proceeding.[27]

Then, under section 1517, a foreign proceeding may only be recognized if the "foreign representative" applying for recognition is a person or body. As further explained in section 101(24) of the Bankruptcy Code:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.[28]

Under section 101(41) of the Bankruptcy Code, the "term 'person' includes [an] individual . . . ."[29]

The final requirement for recognition under chapter 15 is set forth in section 1515, which provides that a chapter 15 petition must be accompanied by (1) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative, (2) a certificate from the foreign court affirming the existence of the foreign proceeding and appointment of the foreign representative or (3) in the absence of either of these, any other evidence acceptable to the court of the existence of the foreign proceeding and appointment of the foreign representative.

For purposes of this report, I shall assume that these basic section 1515 procedural requirements will be met when the chapter 15 petition is presented to the American bankruptcy court.

---

[24] In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 131 (Bankr. S.D.N.Y. 2007) aff'd, 389 B.R. 325 (S.D.N.Y. 2008). *See also* In re Ran, 607 F.3d at 1027 ("In the context of corporate debtors, there must be a place of business for there to be an establishment.").

[25] In re British Am. Ins. Co. Ltd., 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010).

[26] In re Tradex Swiss AG, 384 B.R. 34, 42 (Bankr. D. Mass. 2008).

[27] *Id.* at 42 (suggesting that under such circumstances, the question becomes whether the case will be recognized as a main or nonmain proceeding).

[28] 11 U.S.C. § 101(24).

[29] 11 U.S.C. § 101(41).

11

If the requirements for recognition are satisfied, section 1517(a) provides that "after notice and a hearing, an order recognizing a foreign proceeding shall be entered."

Upon recognition (1) "the foreign representative has the capacity to sue and be sued in a court in the United States," (2) "the foreign representative may apply directly to a court in the United States for appropriate relief in that court" and (3) "a court in the United States shall grant comity or cooperation to the foreign representative."[30]

Whether a foreign proceeding is main or nonmain, section 1521 allows a court to grant relief, including injunctive relief, to assist the administration of the foreign proceeding. To obtain relief under Section 1521, the relief must be "necessary to effectuate the purpose of ... [chapter 15] and to protect the assets of the debtor or the interests of creditors." Courts have held that section 1521 is coextensive with relief otherwise available under U.S. law and allows a court to provide the same relief in a chapter 15 case as would be available to a trustee or debtor in possession in a chapter 11 case.[31]

### a.  The Public Policy Exception

It should be noted that section 1506 provides an overriding public policy exception to all of chapter 15: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."[32]

Some commentators in the United States have expressed concerns about the recognition of schemes of arrangement under chapter 15, and have thus argued that recognition should be denied or limited under section 1506.[33] This literature is focused on the specific issue of solvent schemes of arrangement in the insurance context, and thus is arguably inapplicable to the present matter.

Moreover, to the best of my knowledge, no court has agreed with these commentators to date. Indeed, section 1506 was not intended to ensure the application of American legal principles in all respects. As the legislative history

---

[30] 11 U.S.C. § 1509(b).

[31] In re Vitro S.A.B. de CV, 701 F.3d 1031, 1057 (5th Cir. 2012) *cert. dismissed*, 133 S. Ct. 1862, 185 L. Ed. 2d 862 (2013).

[32] 11 U.S.C. § 1506.

[33] Susan Power Johnston and Martin Beeler, *Solvent Insurance Schemes Should Not Be Recognized [Reprised]*, 17 J. Bankr. L. & Prac. 6 (Sept. 2008); Susan Power Johnston, *Why U.S. Courts Should Deny or Severely Condition Recognition to Schemes of Arrangement for Solvent Insurance Companies*, 16 Norton J. Bankr. L. & Prac. 953 (Dec. 2007); *see also* J.H. Oliverio, *The Great Instrument of Chicanery: An Appeal for Greater Judicial Scrutiny of Solvent Insurers' Schemes of Arrangement*, 17 Roger Williams U. L. Rev. 439 (2012).

explains and several courts have noted, this public-policy exception should be narrowly construed and only "invoked when the most fundamental policies of the United States are at risk."[34]

As the United States Court of Appeals for the Second Circuit, which includes the important commercial jurisdiction of New York, recently explained:

> The statutory wording requires a narrow reading. Section 1506 does not create an exception for any action under Chapter 15 that may conflict with public policy, but only an action that is "*manifestly contrary*."[35]

### b. In re Barnet

A relatively recent case from the Second Circuit Court of Appeals, *In re Barnet*, holds that debtors seeking recognition under chapter 15 must meet the requirements of chapter 1, including section 109(a).[36] That provision, entitled "Who may be a debtor," allows for the filing of a bankruptcy petition by "a person that resides or has a domicile, a place of business, or property in the United States."[37]

First, it should be noted that this case only applies within the Second Circuit, which includes Vermont, Connecticut, and, importantly, New York. It has thus far been rejected in other jurisdictions, including Delaware, which is in the Third Circuit, and where I am told Metinvest's chapter 15 case is most likely to file.[38]

Moreover, the standard of section 109(a) is rather easily met in any event. A recent New York case held that bonds issued with New York choice of law and forum selection clauses constituted "property" sufficient to satisfy section 109(a).[39] Indeed, caselaw makes clear that *any* amount of property in the United States will satisfy the requirements of the section.[40]

---

[34] In re Ernst & Young, Inc., 383 B.R. 773, 781 (Bankr. D. Colo. 2008); *see also* In re ABC Learning Centres Ltd., 728 F.3d 301, 309 (3d Cir. 2013) *cert. denied*, 134 S. Ct. 1283 (2014); In re Ephedera Products Liability Litigation, 349 B.R. 333, 336 (S.D.N.Y. 2006) (holding that denial of constitutional right to jury trial was not manifestly contrary to U.S. public policy where claimants were assured of a fair hearing).

[35] In re Fairfield Sentry Ltd., 714 F.3d 127, 139 (2d Cir. 2013) (emphasis in original).

[36] In re Barnet, 737 F.3d 238, 247-48 (2d Cir. 2013).

[37] 11 U.S.C. §109(a).

[38] In re Bemarmara Consulting a.s., Case No. 13-13037 (Bankr. D. Del. Nov 15, 2013). Judge Gross accepted the argument that a chapter 15 case is filed by the representative of the foreign debtor, not the foreign debtor itself, and thus section 109 was inapplicable. Transcript of Dec. 17, 2013, at page 9. The Second Circuit rejected that argument in its ruling in *Barnet*.

[39] In re Berau Capital Res. Pte Ltd, No. 15-11804(MG), 2015 WL 6507871, at *3 (Bankr. S.D.N.Y. Oct. 28, 2015) ("The Court concludes that the presence of the

And as one New York bankruptcy court recently summarized, "Section 109(a) says nothing about the amount of such property nor does it direct that there be any inquiry into the circumstances surrounding the debtors' acquisition of the property."[41]  In that case, the court expressly rejected the argument that it was somehow objectionable to establish a bank account in the United States for the sole purpose of meeting the requirements of section 109.  Indeed, every year many foreign corporations do just that in order to file chapter 11 cases within the United States.[42]

I am told that Metinvest has several American subsidiaries, with mining operations in various states in this country.  This provides evidence of property in the United States.  Thus I will assume for purposes of this report that satisfaction of the requirements of section 109(a) will be plead as part of the chapter 15 petition, even if that requirement might not be strictly applicable if the petition is filed in Delaware.

* * *

With that background, in the next section I consider the chapter 15 factors for recognition of foreign nonmain proceedings in connection with the Scheme.

## VI.    The Proposed Scheme and Chapter 15

As noted, the Scheme will be recognized under chapter 15 if (1) the Scheme is found to be a foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body, and (3) the petition meets the procedural requirements of section 1515 of the Bankruptcy Code.

The Chief Legal Officer and Member of the Executive Committee at Metinvest Holding, LLC appointed as foreign representative will unmistakably be a person, as defined in the Code, and I assume that the procedural requirements of section 1515 will be met at the time the chapter 15 petition is filed in the United States.

---

New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement.").  A copy of the decision is available at http://business-finance-restructuring.weil.com/wp-content/uploads/2015/11/In-re-Berau.pdf

[40] One court has held that "a dollar, a dime or a peppercorn" located in the United States will suffice.  In re McTague, 198 B.R. 428, 432 (Bankr. W.D.N.Y. 1996).  *See also* In re Yukos Oil Co., 321 B.R. 396, 407 (Bankr. S.D. Tex. 2005).

[41] In re Suntech Power Holdings Co., Ltd., 520 B.R. 399, 413 (Bankr. S.D.N.Y. 2014) (quotation omitted).

[42] *See generally* Oscar Couwenberg & Stephen J. Lubben, *Corporate Bankruptcy Tourists*, 70 Bus. Law. 719 (2015).

Thus, the primary question is whether the Scheme is properly termed a foreign nonmain proceeding under section 1502. And we might also consider if there are any obvious reasons why the Scheme could be questioned under section 1506's "public policy" exception.

As noted, extensive experience from prior cases supports a finding that a scheme of arrangement is a foreign proceeding. The question is then whether Metinvest has an "establishment" in the United Kingdom, which would complete the requirements for finding a foreign nonmain proceeding that could be recognized under chapter 15.

The question is whether Metinvest has "a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property."[43] If so, the American courts will find an establishment.

Registering the UK Branch with Companies House in London might not alone be sufficient to warrant a finding of an establishment. But the conduct of corporate finance and treasury services and other tasks connected with the restructuring and ongoing management of Metinvest's financial indebtedness in London, combined with the engagement of at least one employee of the Group in the jurisdiction to provide those services, does indicate a local effect on the London marketplace.

Metinvest is a holding company, whose operations are conducted through subsidiaries. Three of those subsidiaries are English corporations. One of those subsidiaries, as discussed above, employs more than 100 people in the United Kingdom. That provides further evidence of an "establishment" in the United Kingdom.

And it would seem that issuing debt with an English choice of law clause, and a consent to delivery of notices in England, along with the appointment of a London based trustee to oversee those debt obligations, would itself suggest a local effect on the London marketplace, sufficient to support a finding of an establishment.

Section 1502(2) refers to an establishment as "any place of operations where the debtor carries out a nontransitory activity." Negotiating and servicing large amounts of debt certainly constitutes nontransitory economic activity in the United Kingdom.

Thus, taken as a whole, Metinvest conducts various sorts of enduring economic activity in the United Kingdom. As such, it has an establishment in the United Kingdom. That, combined with the evident fact that the Scheme will be a "foreign proceeding" under American law, means that the Scheme will be recognized as a foreign nonmain proceeding under chapter 15.

---

[43] In re British Am. Ins. Co. Ltd., 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010).

15

A creditor might argue that recognition of the Scheme should be denied under section 1506's "public policy" exception. But again, section 1506 does not create an exception for any action under Chapter 15 that may conflict with public policy, broadly defined, but only an action that is "manifestly contrary" to U.S. public policy.

It is difficult to envisage such an argument with respect to the Scheme as the rights of most of the Group's stakeholders are unaffected by the Scheme. And the noteholders, who are the subject of the Scheme, voluntarily invested in debt subject to English law. As noted, under longstanding principles of American law, contract law is deemed to include non-bankruptcy insolvency and reorganization procedures enacted before the signing of the contract.

Under that rule, the holders of the Metinvest debt would be deemed on notice of the possibility of a scheme of arrangement, and thus precluded from arguing that such a scheme somehow was manifestly contrary to U.S. policy. Instead, U.S. policy is particularly apt to enforce contractual agreements between sophisticated parties, and the Metinvest debt agreements certainly qualify as such.[44]

## VII.    Opinion and Certifications

Based on the foregoing analysis, it is my opinion that an American bankruptcy court will recognize the Scheme as a foreign nonmain proceeding under chapter 15 of the Bankruptcy Code. Such recognition will then allow the American court to enter orders in support of the Scheme.

---

[44] *See* Metro. Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1525 (S.D.N.Y. 1989) ("[T]hese informed plaintiffs least require a Court's equitable protection; not only are they willing participants in a largely impersonal market, but they also possess the financial sophistication and size to secure their own protection.").

In reporting on the Scheme as an independent expert, I recognize that I owe a duty to the Court to assist on matters within my expertise. This duty overrides any obligation to the parties from whom I have received instructions.[45] I believe that I have complied, and confirm that I will continue to comply, with this duty.

I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.

I also confirm that I am aware of the duties and requirements regarding experts set out in Part 35 of the Civil Procedure Rules, practice direction 35 and the Protocol for Instruction of Experts to give Evidence in Civil Claims, having reviewed all as available on the internet.

Respectfully Submitted,

**Stephen J. Lubben**
New York, New York
Monday, December 28, 2015

---

[45] *See* Rule 35.3.

17

**Exhibit A**
**(Author's CV)**

# Stephen J. Lubben

Harvey Washington Wiley Chair in Corporate Governance & Business Ethics
Seton Hall University School of Law
One Newark Center
Newark, New Jersey 07102
973/642-8857
stephen.lubben@shu.edu
sjl@post.harvard.edu

### Education
Ph.D., University of Groningen, Faculty of Law, Department of Law & Economics, 2010
LL.M., Harvard Law School, 2000
J.D., *Magna Cum Laude*, Boston University School of Law, 1996
B.A., University of California, Irvine, 1993

### Employment
Harvey Washington Wiley Chair in Corporate Governance & Business Ethics, Seton Hall
        University School of Law, 2012-present
Daniel J. Moore Professor of Law, Seton Hall University School of Law, 2008-2012
Professor of Law, Seton Hall University School of Law, 2007-2008
Associate Professor of Law, Seton Hall University School of Law, 2002-2007
Associate, Skadden, Arps, Slate, Meagher & Flom LLP, 2000-2002 (Los Angeles), 1997-1999 (New
        York).
Law Clerk, New Hampshire Supreme Court, Hon. John T. Broderick, Jr., 1996-1997

### Professional Activities
*In Debt* columnist for the *New York Times'* Dealbook business page, 2010-present, available at
        *http://www.nytimes.com/column/dealbook-in-debt*
Regular Contributor, Credit Slips Blog, 2008-present, available at
        *http://www.creditslips.org/creditslips/LubbenAuthor.html*
Contributing Author, Bloomberg Law: Bankruptcy Treatise
ABI Chapter 11 Reform Commission, Advisory Committee on Financial Contacts, Derivatives and
        Safe Harbors, 2012-2014
Rudolph Steiner School Board of Trustees, New York, New York, 2012-2015
American Bankruptcy Institute Law Review Advisory Board, 2010-2015
Reporter and Principal Investor, ABI Chapter 11 Fee Study ($346,000 research grant), 2005-2007

### Bar Memberships & Professional Affiliations
New York (Third Department), California, S.D.N.Y.; E.D.N.Y.; C.D. Cal.; N.D. Cal.; E.D. Cal.;
        S.D. Cal.
American College of Bankruptcy
International Insolvency Institute
American Law and Economics Association
European Association of Law and Economics
American Finance Association
American Bankruptcy Institute

### Awards
2010-11 Seton Hall University Researcher of the Year
2011 Seton Hall University School of Law Professor of the Year nominee
2005-06 Seton Hall University Researcher of the Year

American Bankruptcy Institute Medal Recipient, Harvard Law School, 2000
Edward F. Hennessy Scholar, Boston University School of Law, 1996
G. Joseph Tauro Distinguished Scholar, Boston University School of Law, 1993

**Publications and Working Papers**
The Overstated Absolute Priority Rule, available at
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2581639
Failure of the Clearinghouse: Dodd-Frank's Fatal Flaw?, 10 Va. L. & Bus. Rev.– (forthcoming
    2016).
Corporate Bankruptcy Tourists, 70 Bus. Law. 719 (2015) (co-authored with O. Couwenberg).
The Board's Duty to Keep Its Options Open, 2015 Ill. L. Rev 817.
Essential Corporate Bankruptcy, 16 Eur. Bus. Org. L. Rev. 39 (2015) (co-authored with O.
    Couwenberg).
Puerto Rico and the Bankruptcy Clause, 88 Am. Bankr. L.J. 553 (2014).
Reconceptualizing Lehman, 49 Tex. Int'l L.J. 295 (2014) (co-written with Sarah P. Woo).
CORPORATE FINANCE (Wolters Kluwer Law & Business 2014).
A New Understanding of the Bankruptcy Clause, 64 Case W. Res. L. Rev. 319 (2013).
Solving Creditor Problems in the Twilight Zone: Superfluous Law and Inadequate Private
    Solutions, 34 Int'l Rev. L. & Econ. 61 (2013) (co-authored with O. Couwenberg).
Separation and Dependence:  Explaining Modern Corporate Governance, 43 Seton Hall L. Rev.
    893 (2013) (Wiley chair lecture).
CDS and the Resolution of Financial Distress, 24 J. Applied Corp. Fin. 129 (2012) (co-written
    with Rajesh P. Narayanan)
The Chapter 11 Attorneys, 86 Am. Bankr. L.J. 447 (2012).
Transaction Simplicity, 112 Colum. L. Rev. Sidebar 194 (2012) (solicited).
Involuntary Creditors and Corporate Bankruptcy, 45 U.B.C. L. Rev. 253 (2012) (co-authored
    with Stephanie Ben-Ishai).
Resolution, Orderly and Otherwise:  B of A in OLA, 81 U. Cin. L. Rev. 485 (2012) (solicited).
Do Empirical Bankruptcy Studies Matter?, 20 ABI L. Rev. 715 (2012) (solicited).
Chapter 11 as Intrigue:  A Review of LoPucki and Doherty's Professional Fees in Corporate
    Bankruptcies, 28 Banking and Finance Law Review (Canada) 171 (2012) (solicited).
What We "Know" About Chapter 11 Cost is Wrong, 17 Fordham J. of Corp. & Fin. L.141 (2012).
The Chapter 11 Financial Advisors, 28 Emory Bankr. Dev. J. 11 (2011).
Bankruptcy as Bailout, 6 Brook. J. Corp., Fin. & Com. Law 1 (2011) (solicited) (co-authored
    with Stephanie Ben-Ishai).
Financial Institutions in Bankruptcy, 34 Seattle L. Rev. 1259 (2011) (solicited).
Sales or Plans:  A Comparative Account of the "New" Corporate Reorganization, 56 McGill L.J.
    591 (2011) (co-authored with Stephanie Ben-Ishai).
Chapter 11 in Context:  American and Dutch Business Bankruptcy, 85 Am. Bankr. L.J. 63 (2011)
    (co-authored with O. Couwenberg).
The Types of Chapter 11 Cases, 84 Am. Bankr. L.J 233 (2010).
The Bankruptcy Code Without Safe Harbors, 84 Am. Bankr. L.J 123 (2010).
Repeal the Safe Harbors, 18 A.B.I. L. Rev. 319 (2010).
Accidental Convergence: Corporate Reorganization in Two Federal Systems, 26 Emory Bankr.
    Dev. J.  33 (2009).
No Big Deal:  The GM and Chrysler Cases In Context, 83 Am. Bankr. L.J. 531 (2009).
Chapter 11 "Failure", 2009 Working Paper (available on SSRN).
The Truth About Detroit's Bankruptcies, Forbes, July 26, 2009 (op-ed piece)
    (http://www.forbes.com/2009/07/26/chrysler-gm-bankruptcy-opinions-contributors-
    chapter-11-tarp.html).
Chapter 11 and Systemic Risk, 82 Temp. L. Rev. 433 (2009) (solicited).
Derivatives and Bankruptcy:  The Flawed Case for Special Treatment, 12 U. Pa. J. Bus. L. 61
    (2009).
The Sale of the Century and Its Impact on Asset Securitization: Lehman Brothers, 27 Am. Bankr.
    Inst. Journal Vol. 10, page 1 (2009).

Financial Distress in Emerging Markets, in EMERGING MARKETS: PERFORMANCE, ANALYSIS AND
      INNOVATION (Greg N. Gregoriou ed. Chapman-Hall /Taylor and Francis 2009).
Corporate Reorganization & Professional Fees, 82 Am. Bankr. L.J. 77 (2008).
Credit Derivatives and the Resolution Of Financial Distress, in THE CREDIT DERIVATIVES
      HANDBOOK (Greg N. Gregoriou & Paul U. Ali eds. McGraw-Hill 2008).
Delaware's Irrelevance, 16 A.B.I. L. Rev. 267 (2008).
ABI CHAPTER 11 FEE STUDY (2007).
Credit Derivatives & The Future of Chapter 11, 81 Am. Bankr. L.J. 405 (2007).
Business Liquidation, 81 Am. Bankr. L.J. 65 (2007).
The Microeconomics of Chapter 11, Part 2, 4 Int'l. Corp. Rescue 87 (2007).
The Microeconomics of Chapter 11, Part 1, 4 Int'l. Corp. Rescue 31 (2007).
Choosing Corporate Bankruptcy Counsel, 12 A.B.I. L. Rev. 391 (2006).
Delaware's Duty of Care, 31 Del. J. Corp. L. 589 (2006), co-written with Alana J. Darnell.
The "New and Improved" Chapter 11, 93 Ky. L.J. 839 (2005) (special, peer-reviewed AALS
      Section on Creditors' and Debtors' Rights issue).
Out of the Past:  Railroads & Sovereign Debt Restructuring, 35 Geo. J. Int'l L. 845 (2004)
      (solicited).
Railroad Receiverships and Modern Bankruptcy Theory, 89 Cornell L. Rev. 1420 (2004).
Beyond True Sales – Securitization and Chapter 11, 1 N.Y.U. J.L. & Bus. 89 (2004).
Some Realism About Reorganization:  Explaining the Failure of Chapter 11 Theory, 106 Dick. L.
      Rev. 267 (2001).
LLM Thesis:  The Direct Costs of Corporate Reorganization:  An Empirical Examination of
      Professional Fees in Large Chapter 11 Cases, 74 Am. Bankr. L.J. 509 (2000).
JD Student Note:  Chief Justice Traynor's Contract Jurisprudence and the Free Law Dilemma:
      Nazism, the Judiciary, and California's Contract Law, 7 S. Cal. Interdisc. L.J. 81 (1998)
      (unpublished by B.U. L. Rev.)


**Presentations & Testimony**
Subsidizing Liquidity or Subsidizing Markets? Safe Harbors, Derivatives, and Finance, at
      "Finance between Liquidity and Insolvency," House of Finance, Goethe University,
      Frankfurt, Germany (Dec. 12, 2015).
Do Chapter 11 Debtors Need to Worry About §1129 Anymore?, American College of Bankruptcy –
      3d Circuit Symposium, University of Pennsylvania Law School, Philadelphia,
      Pennsylvania (November 17, 2015).
Can Regulators End Too Big to Fail?, Americans For Financial Reform's "A Discussion of Dodd-
      Frank Resolution Planning," Washington, D.C. (November 4, 2015).
American College of Bankruptcy and Bloomberg BNA's Supreme Court Review, New York, New
      York (October 23, 2015).  Available at:  https://bol.bna.com/a-supreme-court-review-
      of-bankruptcy-cases/
The Supreme Court's Bankruptcy Opinions This Term, Bloomberg Law:  Eye on Bankruptcy, New
      York, New York (July 30, 2015).  Available at: http://beta.eyeonbankruptcy.org/s1e5/
Reconsidering Safe Harbors For Repurchase Agreements, at 33rd Annual Spring Meeting,
      American Bankruptcy Institute, Washington, D.C. (April 18, 2015).
Corporate Bankruptcy, at New Jersey Supreme Court Committee on Judicial Education's
      General Equity and Civil Division Education Conference, Galloway, New Jersey (March
      27, 2015).
Derivatives and Chapter 11, at Bloomberg BNA & American Bankruptcy Institute's 2015 Outlook
      on Bankruptcy Law, New York, New York (January 29, 2015).
Derivatives and Chapter 11, at the AALS Section on Creditors' and Debtors' Rights, American
      Association of Law Schools Annual Meeting, Washington D.C. (January 4, 2015).
Corporate Bankruptcy Tourists, at 31st Annual Conference of the European Association of Law
      and Economics, Aix-Marseille Université, Aix-en-Provence, France (September 18,
      2014).
Testimony on H.R. ___ Financial Institution Bankruptcy Act of 2014, before the U.S. House
      Judiciary Committee, Washington, D.C. (July 15, 2014).

Proposed Chapter 14 and the Future of Large Financial Institution Resolution, American
   Bankruptcy Institute Webniar (July 15, 2014).
Resolution Regimes for Clearinghouses, at the Chicago Federal Reserve Bank's Workshop on
   Legal Arrangements of Cross-border Resolution and Liquidity in OTC Derivative Markets:
   Theoretical Insights from "A Legal Theory of Finance" and Other Contemporary
   Perspectives, Chicago, Ill. (June 17, 2014).
The Board's Duty to Keep Its Options Open, at the University of Illinois and ABI Chapter 11
   Reform Conference, Chicago, Ill. (April 4, 2014).  Available at: http://abi-
   sessions.s3.amazonaws.com/2014/IS/cle_IS14_BOARD.mp4
OLA After Single Point of Entry: Has Anything Changed?, at Americans For Financial Reform And
   The Roosevelt Institute's Symposium:  An Unfinished Mission: Making Wall Street Work
   for Us, Washington, D.C. (Nov. 12, 2013).
Chapter 11 Professional Issues: Proper Disclosure And Retention And Addressing The New Rules
   Of The Road On Compensation, at National Conference of Bankruptcy Judges Annual
   Conference, Atlanta, Georgia (Nov. 1, 2013).
Essential Corporate Bankruptcy, European Law and Economics Annual Meeting, at University of
   Warsaw, Warsaw, Poland (September 27, 2013).
Dodd-Frank's Orderly Liquidation Authority, at Resolution Authority and Structural Reform
   Conference, NYU Stern School of Business, New York, New York (April 11, 2013).
Invited discussant, GAO/National Academy of Sciences meeting on Treatment Of Financial
   Contracts During Bankruptcy, Washington, D.C. (April 10, 2013).
Resolving Financial Institutions, at 9th Annual Wharton Restructuring and Distressed Investing
   Conference, Philadelphia, Pennsylvania (Feb. 22, 2013).
Reconceptualizing Lehman, at the 2013 Texas International Law Journal Symposium, University
   of Texas, School of Law, Austin, Texas (Feb. 7, 2013).
Do Empirical Bankruptcy Studies Matter? at Bankruptcy and Race:  Is there a Relation?
   Symposium, St. John's University School of Law, Queens, New York (October 19, 2012).
Separation and Dependence:  Explaining Modern Corporate Governance, Inaugural Harvey
   Washington Wiley Lecture, Seton Hall Law School, Newark, New Jersey (October 2,
   2012).
The Government's Role in Recent Litigation (Argentina and the Automakers), testimony before
   the U.S. House Financial Services Subcommittee on Subcommittee on Capital Markets
   and Government Sponsored Enterprises, Washington D.C. (June 7, 2012).
International Insolvency Institute Delegate, at UNCITRAL Insolvency Working Group Meeting,
   New York, New York (April 30, 2012 to May 4, 2012).
What Counterparties to Financial Contracts Deserve Special Treatment?, at World Bank/ABI
   Working Group on Financial Contracts in Bankruptcy workshop, Washington, D.C. (April
   20, 2012).
Resolution, Orderly and Otherwise:  B of A in OLA, at 25th Annual Corporate Law Center
   Symposium, University of Cincinnati College of Law, Cincinnati, Ohio (March 30, 2012).
   Available at: http://www.youtube.com/watch?v=y-Def3btxVw
Institutional Investor Educational Foundation, Bankruptcy Round Table, New York, New York
   (March 12, 2012).
Keynote Address (Resolution, Orderly and Otherwise), at American Bankruptcy Institute 8th
   Annual Corporate Restructuring Competition, The Wharton School, University of
   Pennsylvania, Philadelphia, Pennsylvania (November 3, 2011).
Involuntary Creditors and Corporate Bankruptcy, European Law and Economics Annual Meeting,
   at University of Hamburg School of Business, Economics and Social Sciences, Hamburg,
   Germany (Sept. 22, 2011).
Dodd-Frank Orderly Liquidation Authority and Ending "Too Big to Fail," testimony before the
   U.S. House Financial Services Subcommittee on Financial Institutions and Consumer
   Credit, Washington D.C. (June 14, 2011).
Dodd-Frank's New Resolution Authority, at Association Française en Faveur de l'Institution
   Consulaire (AFFIC 91) & Clifford Chance's "Learning The Lessons From The Crisis:

4

Improvement Of National And European Insolvency Laws" Symposium, Paris, France (April 18th, 2011).

Bankruptcy as Bailout, at Comparative Approaches to Systemic Risk and Resolution Symposium, Brooklyn Law School, Brooklyn, New York (February 25, 2011).

Examining Chapter 11 Cost, at Big-Case Bankruptcy Empirical Research Agenda, UCLA School of Law, Los Angeles, California (February 11, 2011).

The Risks Of Fractured Resolution – Finance And Bankruptcy, at Adolf A. Berle, Jr. Center on Corporations, Law and Society Annual Symposium, Seattle University School of Law, Seattle, Washington (January 21, 2011).

Professional Fees in Mega-Chapter 11 Cases: Reasonable or Out of Control? at Winter Leadership Meeting, American Bankruptcy Institute, Scottsdale, Arizona (December 11, 2010).

Bankruptcy, the Constitution, and Government Controlled Corporations, at The Constitution in the Financial Crisis Symposium, Constitutional Law Center, Stanford Law School, Stanford, California (November 11, 2010).  Available at:  http://www.c-spanvideo.org/program/296541-2

Sales or Plans:  A Comparative Account of the "New" Corporate Reorganization, at The Canadian Law and Economics Association, University of Toronto, Toronto, Ontario. (October 2, 2010).

What We "Know" About Chapter 11 Cost is Wrong, European Law and Economics Annual Meeting, at Université Paris 2 Pathèon-Assas, Paris, France (Sept. 24, 2010).

Sales or Plans:  A Comparative Account of the "New" Corporate Reorganization, at European Law and Economics Annual Meeting, Université Paris 2 Pathèon-Assas, Paris, France (Sept. 23, 2010).

Sales or Plans:  A Comparative Account of the "New" Corporate Reorganization, American Law and Economics Association (ALEA) Annual Meeting, Princeton University, Princeton, New Jersey (May 7, 2010).

Too Big To Fail: How Should The U.S. Handle The Collapse Of Systemically Important Firms?, 2010 Dow Jones Daily Bankruptcy Review Restructuring & Turnaround Summit, New York, New York (March 10, 2010).

Repeal the Safe Harbors, Chapter 11 at the Crossroads: Does Reorganization Need Reform?, Georgetown Law School, Washington, D.C. (Nov. 16, 2009).

Chapter 11 in Context: American and Dutch Business Bankruptcy, Advanced Bankruptcy Colloquium, Brooklyn Law School, Brooklyn, New York (Oct. 14, 2009).

Chapter 11 in Context: American and Dutch Business Bankruptcy, European Law and Economics Annual Meeting, at Università Luiss Guido Carli, Rome, Italy (Sept. 18, 2009).

Testimony on Automotive Bankruptcy Cases, TARP Congressional Oversight Panel field hearing, Detroit, Michigan (July 27, 2009).

Chapter 11 in Context: American and Dutch Business Bankruptcy, INSOL Eight World Congress, Academic Meeting, Vancouver, Canada (June 20, 2009).

Derivatives and Bankruptcy:  The Flawed Case for Special Treatment at American Law and Economics Association (ALEA) Annual Meeting, University of San Diego School of Law, San Diego, California (May 16, 2009).

Complexity in Chapter 11 Reorganizations, at Complexity and Collapse: The Credit Crisis Symposium, Temple Law School, Philadelphia, Pennsylvania (April 28, 2009).

Credit Derivatives and Chapter 11, at 11th Annual Hon. William H. Gindin Bankruptcy Bench-Bar Conference, New Brunswick, New Jersey (April 17, 2009).

Chapter 11 and Systemic Risk, at Temple Law Review Symposium, Temple Law School, Philadelphia, Pennsylvania (April 16, 2009) .

Chapter 11 "Failure" at the Cornell Law School-University of Tel Aviv Faculty of Law's International Empirical Legal Studies Conference, at the University of Tel Aviv, Tel Aviv, Israel (March 26, 2009).

The Uncertain Future of Asset Securitization (and Credit Derivatives), at New York City Bar Associations Structure Finance Committee Meeting, New York, New York (January 9, 2009).

5

Credit Default Swaps – What Are They? -- The Bankruptcy Process and Impact, at AIRA Advanced Restructuring and Plan of Reorganization Conference, New York, New York (October 21, 2008).

Professional Fees in Chapter 11 (The ABI Chapter 11 Fee Study), at National Conference of Bankruptcy Judges Annual Meeting, Scottsdale, Arizona (September 24-27, 2008).

The Types of Chapter 11 Cases, at Third Annual Conference on Empirical Legal Studies, Cornell Law School, Ithaca, New York (September 12-13, 2008).

Corporate Reorganization & Professional Fees, at American Law and Economics Association (ALEA) Annual Meeting, Columbia Law School, New York, New York (May 16-17, 2008).

ABI Landmark Fee Study: Moving-Forward Analysis, at 10th Annual New York City Bankruptcy Conference, New York, New York (May 12, 2008).

Credit Default Swaps: A Critical Risk Transfer Tool in Volatile Markets, at 2008 Distressed & Turnaround Investment Forum, New York, New York (May 15, 2008).

Cross-boarder Restructuring:  An American Perspective, at Advanced Bankruptcy Law Seminar, University of Toronto Faculty of Law, Toronto, Ontario (March 28, 2008).

Chapter 11 & Professional Fees, at Seton Hall Faculty Scholarship Retreat, New York, New York (January 2008).

ABI Chapter 11 Fee Study, at Winter Leadership Meeting, American Bankruptcy Institute, Rancho Mirage California (December 2007).

Delaware's Irrelevance, at 2007 Meetings of The Canadian Law and Economics Association, University of Toronto, Toronto, Ontario. (September 28-29, 2007).

Delaware's Irrelevance, at 24th Annual European Association of Law and Economics Conference, Copenhagen Business School, Copenhagen, Denmark (September 13-15, 2007).

Credit Derivatives & The Future of Chapter 11, at 24th Annual European Association of Law and Economics Conference, Copenhagen Business School, Copenhagen, Denmark (September 13-15, 2007).

Delaware's Irrelevance, at Workshop on Private and Public Resolution of Financial Distress, Institute for Advances Studies, Vienna, Austria (June 1-2, 2007).

Credit Derivatives & The Future of Chapter 11, at American Law and Economics Association (ALEA) Annual Meeting, Harvard Law School, Cambridge, Massachusetts (May 5-6, 2007).

The Microeconomics of Chapter 11, at the 2006 Meetings of The Canadian Law and Economics Association, University of Toronto, Toronto, Ontario. (September 29-30, 2006).

The Microeconomics of Chapter 11, at the 23rd Annual European Association of Law and Economics Conference, Instituto de Empresa Business School, Madrid, Spain (September 14-19, 2006).

Credit Derivatives & The Future of Chapter 11, at Summer Faculty Scholarship Workshop, Seton Hall University School of Law, Newark, N.J. (June 7, 2005).

The Microeconomics of Chapter 11, at Harvard-University of Texas Conference on Commercial Law Realities, Harvard Law School, Cambridge, Massachusetts (April 28, 2006).

Professional Compensation in the Post-BAPCPA Environment, at American Bankruptcy Institute Annual Meeting, Washington, D.C. (April 22, 2006).

The Microeconomics of Chapter 11 and the Irrelevance of Ex Ante Costs, at Law and Economics Seminar, Boston University Law School, Boston, Massachusetts ((January 23, 2006).

Real Options and the Other Liquidation Decision, at Faculty Colloquium, Seton Hall University School of Law, Newark, N.J. (November 14, 2005).

The Microeconomics of Chapter 11, at New York Junior Faculty Forum, Fordham Law School, New York, New York (October 21, 2005).

Real Options and the Other Liquidation Decision, at the 2005 Meetings of The Canadian Law and Economics Association, University of Toronto, Toronto, Ontario. (September 24, 2005).

The Microeconomics of Chapter 11, at Summer Faculty Scholarship Workshop, Seton Hall University School of Law, Newark, N.J. (July 12, 2005)

Real Options and the Other Liquidation Decision, at the 4th Annual Conference of the Israeli Law and Economics Association, University of Haifa, Haifa, Israel. (May 26, 2005).

6

Real Options and the Other Liquidation Decision, at the Harvard-University of Texas Conference on Commercial Law Realities, University of Texas School of Law, Austin, Texas (April 8, 2005).

The "New and Improved" Chapter 11, at the AALS Section on Creditors' and Debtors' Rights, American Association of Law Schools Annual Meeting, San Francisco, C.A. (January 8, 2005).  Responses presented by Profs. Douglas G. Baird, Robert K. Rasmussen, and Jay Lawrence Westbrook.

Out of the Past:  Railroads & Sovereign Debt Restructuring, at Sovereign Debt Restructuring: The View From the Legal Academy symposium, Georgetown University Law Center, Washington, D.C. (February 26, 2004).

Railroad Receiverships and Modern Bankruptcy Theory, at the Sloan Interdisciplinary Workshop, Georgetown University Law Center, Washington, D.C. (November 21, 2003).

**EXHIBIT E**



*Structure of METINVEST Group (main assets) as of 31 October 2015*